**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lowell M. BIRRELL, Defendant-Appellant.**

**No. 293, Docket 72–1470.**

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1972.

Decided Dec. 4, 1972.

114

H. Elliot Wales, New York City and Lowell M. Birrell, pro se, for defendant-appellant.

Walter M. Phillips, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., and Richard J. Davis, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Before FRIENDLY, Chief Judge, and MEDINA and ANDERSON, Circuit Judges.

FRIENDLY, Chief Judge:

This is an appeal from a con-, viction for perjury, defined and made punishable in 18 U.S.C. § 1621. The facts constituting the offense were hardly in dispute. The Government sought to establish, and the jury permissibly found, that on August 28, 1970, Lowell M. Birrell signed an affidavit before a notary public in which he swore, *inter alia*, "I am presently unemployed and I am not receiving any income." This affidavit was filed with the clerk of this court in support of Birrell's motion for leave to proceed *in forma pauperis* and for appointment of new counsel under

the Criminal Justice Act, 18 U.S.C. § 3006A, on an appeal from a conviction under another unrelated indictment.[1] At the time the affidavit was signed, Birrell was in fact a consultant working for East West Shipping Agencies, Inc. under a retainer of $200 per week. The Government's evidence consisted of testimony of Paul Halloran, an official of East West, and documents subpoenaed from East West, including cancelled checks drawn on that company and endorsed by Birrell and receipts given by Birrell in return for payment, all of which indicated that Birrell worked for and was paid by East West during the period from March, 1970 to March, 1971.

Birrell's principal contention on appeal is that the initial lead which induced the Government to subpoena the witness and documents used at trial was obtained in a manner violative of the search and seizure provision of the Fourth Amendment. No hearing was held on Birrell's motion to suppress; rather each side submitted affidavits, on

the basis of which the judge ruled that no hearing was necessary since he could reconsider the matter and grant a hearing, if this seemed desirable, in the event of a conviction. When a motion to suppress has been made prior to trial, we do not approve such an extension of the practice of postponing a "taint" hearing until after verdict, which was devised by the late Judge Herlands to meet the exceedingly hard problem confronting him in another prosecution of the appellant, United States v. Birrell, 269 F.Supp. 716 (S.D.N.Y.1967); in such cases there may indeed be serious difficulties in conducting a "taint" hearing until the court knows what evidence the Government will offer.[2] Here the issue was not "taint" but the legality of the search. It was clear, as the Government conceded at argument, that if the search was illegal, all the evidence with respect to Birrell's employment to be offered at trial would be tainted. The only justification for not holding a pretrial hearing as to the legality of the

1. Appellant's argument that his misstatement was not "material" within the meaning of § 1621 is unconvincing. Two separate contentions are made. First, appellant correctly notes that under F.R.A.P. 24 an appeal may proceed *in forma pauperis* upon an appropriate finding by the district court "without further application to the court of appeals," and that under the Criminal Justice Act no finding of indigency independent of one made by the district court need be made. Since Birrell's motion was primarily to have new counsel appointed in lieu of the attorney who had represented him in the district court, the sworn statement of unemployed status was, Birrell argues, mere surplusage and thus not "material." The fact that Birrell was under no obligation to divulge the information in question, however, does not imply that a false sworn statement, when made, is not material. Nothing in the Federal Rules of Appellate Procedure or the Criminal Justice Act precludes this court, on motion by the government or *sua sponte*, from inquiring into the financial status of an appellant proceeding *in forma pauperis* with appointed counsel. Indeed, 18 U.S.C. § 3006A(c), (f) indicates that the court is under a continuing obligation to supervise appointments already made to insure that they reflect current financial status. Birrell's statement was clearly material in dissuading the court or the Government from raising such a question. Second, Birrell argues that his financial status in fact would have made him eligible for appointed counsel irrespective of the income concealed by the statement in question because he was "indigent" although employed. It is clear, however, that a mistatement of fact does not need to be dispositive of the inquiry in question to be "material" within the meaning of § 1621. Rather "it must be shown that a truthful answer would have been of sufficient probative importance to the inquiry so that, as a minimum, further fruitful investigation would have occurred.'" United States v. Freedman, 445 F.2d 1220, 1227 (2 Cir. 1971). See also United States v. Weiler, 143 F.2d 204 (3 Cir. 1944), rev'd on other grounds, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945).

2. Even in such cases there may be question —which we do not decide—whether if a post-verdict taint hearing is ultimately determined in favor of a defendant who has objected to that procedure, the due process and double jeopardy clauses would permit a retrial.

search in this case was that the facts were essentially undisputed. To these we now turn.

In the afternoon of March 7, 1971, Sarah Naomi Belle was found dead, apparently the victim of a homicide, in her apartment in the Chalfonte Hotel on the Manhattan West Side. The police summoned to investigate found in the room, among other things, a suitcase, a trunk, and boxes containing numerous documents. Assuming from the fact that Mrs. Belle appeared to be living alone that the objects were hers, the police removed them to the 20th Precinct stationhouse. Around 2:00 a. m. the next morning Birrell, accompanied by a lawyer, appeared at the police station, claimed ownership of certain documents taken from Mrs. Belle's room, and demanded their return. He was informed that permission would have to be granted by the District Attorney's Office before the documents could be returned.

The March 8, 1971 issue of the New York Daily News contained an article covering the killing of Mrs. Belle, printed with a photograph of Birrell. In this article the newspaper quoted the statement of an official of the Chalfonte Hotel that the rent of the apartment, amounting to $240 a month, had been paid over the past year by Birrell. This came to the attention of Walter M. Phillips, Jr., an Assistant United States Attorney who had been in charge of the prosecution of an earlier indictment against Birrell. Aware that Birrell had filed an affidavit of indigency, and with his suspicions aroused by Birrell's apparent ability to pay so large a sum of money for another's rent, Phillips contacted the police at the 20th Precinct, ascertained that documents possibly belonging to Birrell were in custody there, and asked to be able to look through them. After receiving permission from the District Attorney's Office, Phillips instructed Anthony Passaretti, an agent attached to the Internal Revenue Service, to go to the police station and examine the documents for evidence of Birrell's financial status.

Passaretti went to the police station on March 12, 1971. There he was told by police officers, prior to his examination of the documents, that the records were found in the apartment of Mrs. Belle, that the police had examined them, that they appeared to be "records of various companies with which Mr. Birrell seemed to be connected," and that Birrell had demanded their return. Passaretti found a copy of a receipt given by Birrell to East West Shipping Agencies in exchange for money paid to him. Passaretti turned this copy over to Phillips, who determined that Birrell may have committed perjury in his affidavit of indigency and initiated subpoenas leading to this prosecution.

■ In this court the Government properly does not challenge Birrell's standing to complain of the search of his records. Clearly he would have had standing if a government agent had found the records in the course of a warrantless search of Mrs. Belle's apartment directed at obtaining them, United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1960), and the situation is no different in this respect because the records had passed into the hands of the New York police.

■ The Government argues that the action of the police in removing the trunk, suitcases and boxes from the deceased woman's apartment was entirely proper, and that consequently there was no illegality in Agent Passaretti's warrantless search of them. We agree with the first proposition. The police had a right, indeed a duty, to examine anything in Mrs. Belle's apartment that might cast light on her murder. Appellant's citation of such cases as Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957), and Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), misses the essential point that in them the object of the police activity was complaining of the scope of the search. Mrs. Belle was

the victim of a homicide, not of a search, and it would be the sheerest formalism to require that police officers should obtain a warrant to search everything she had left behind and remove the property to the police station to that end if they considered this would provide added convenience and safety. "[T]he Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); it does not require a warrant for the search of an empty hotel room in aid of investigation of the death of its former occupant. Furthermore, although Birrell was apparently an habitué of the hotel apartment, there is no indication that the police knew or should have known that the objects taken were his, nor was the search directed at him. But acceptance of the Government's first proposition does not entail agreement with its second.

It is understandable that a federal prosecutor might not think it necessary to obtain a warrant in order to search property already in the hands of the city police. But this case must be determined on the basis of its peculiar facts. If the papers had remained in Mrs. Belle's hotel room, United States v. Jeffers, *supra,* is clear authority that federal law enforcement officers could not lawfully have searched them for the purpose of obtaining evidence against Birrell without having obtained a warrant. We fail to see how the taking into custody by the city police, proper though we have held this to be, relieves federal authorities from a requirement that would have existed if Birrell's papers had been left where they were. The propriety of the first intrusion into Birrell's privacy does not automatically sanction a second. Even when a "major" intrusion falls within a recognized exception to the Fourth Amendment, the warrant requirement as to a further "minor" intrusion is not abrogated. See Coolidge v. New Hampshire, 403 U.S. 443, 478–481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). At least this is so, and we need go no further to decide this case, when

Birrell had requested that his papers be returned four days before the search. While the police were justified in retaining the papers for a reasonable time to discover whether they afforded any clues with respect to the homicide, Birrell had sufficiently manifested his claim that a search by law enforcement officers of another sovereign for a different purpose could not be made without a warrant. It can be argued that a different decision would be reached if, for example, the city police, knowing of the federal interest in Birrell, had on their own initiative delivered his papers to the Assistant United States Attorney, since then there would have been no federal seizure. But that was not what happened here, and seemingly thin lines of distinction are not unusual in Fourth Amendment cases.

The judgment is reversed, with instructions to dismiss the indictment.

ROBERT P. ANDERSON, Circuit Judge (concurring in result):

I concur in the result, but I disagree with the implications of some of the rationale relied upon by the majority.

There is no reason why evidence which is legitimately in the hands of one state or federal police department cannot be made available to other state or federal law enforcement agencies without a warrant, even if it is to be used for a different purpose. The majority, relying upon Coolidge v. New Hampshire, 403 U.S. 443, 478–481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), suggests that a second police authority must secure a warrant for its additional "minor" intrusion. This cited portion of *Coolidge* is a reference to the fact that a warrant is required to search a person's home, even if he is arrested in it without a warrant, but I do not see that this *Coolidge* discussion, or any other case, mandates that inter-police-agency use of evidence be restricted.

I concur in the result, however, because I do not think that Birrell's papers were legitimately in the hands of the city police when the federal agent looked

at them. Although his papers were lawfully taken from Mrs. Belle's apartment by the city police, they had no right to retain them when their lawful use of them had terminated, they no longer had need of them, and Birrell had demanded possession of them. The need for a warrant was not to enable the federal agents to get the papers from the city police, but to get by Birrell's right to immediate possession of his own property.