**UNITED STATES of America, Appellee,**

v.

**Arthur TORTORELLO, Appellant.**

**No. 365, Docket 72–1957.**

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1972.

Decided April 5, 1973.

Graham Hughes, New York City (Nancy Rosner, Elliott A. Taikeff, and Rosner & Rosner, New York City, on the brief), for appellant.

Patrick T. Burke, Sp. Atty., Dept. of Justice, Washington, D. C. (Whitney North Seymour, Jr., U. S. Atty., and John W. Nields, Jr., Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FRIENDLY, Chief Judge, and MANSFIELD and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Arthur Tortorello appeals from a judgment of conviction entered upon a jury verdict returned November 12, 1971 after a ten day trial before Milton Pollack, *District Judge*, in the Southern District of New York finding Tortorello guilty on two counts of sale of unregistered securities, in violation of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e(a)(1) and (2) (1970); on two counts of violation of the antifraud provisions of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (a) (1970); on one count of mail fraud, in violation of 18 U.S.C. § 1341 (1970); and on one count of conspiracy to sell unregistered securities, to violate the antifraud provisions of the federal securities laws and to violate the mail fraud statute, in violation of 18 U.S.C. § 371 (1970).[1]

---

1. The indictment, returned October 27, 1970, originally contained 86 counts. It charged appellant Tortorello and eight other defendants—Fred Hesse, Milton H. Peters, Arnold McKinney, John Dennett, Louis Kaye, Jerry Fields, Edward Zuber and Underwriters Investment Company— with the same categories of offenses as stated above. Tortorello and his codefendants herein also were indicted by a New York County Grand Jury on September 30, 1970 for grand larceny based on the fraudulent scheme involved in the federal prosecution.

Prior to the instant trial, on the government's motion, the cases of all defendants except Tortorello and Dennett were severed, as likewise were 80 of the 86 counts.

The trial of defendants Tortorello and Dennett on the remaining six counts of the indictment (Counts 1, 11, 15, 49, 52 and 81) began on November 1, 1971. The jury returned a verdict finding both defendants guilty on each of the six counts on November 12, 1971.

On June 16, 1972, Judge Pollack sentenced appellant Tortorello to concurrent

The chief issue on appeal is whether the trial judge erred in denying after a post-verdict hearing, 342 F.Supp. 1029 (S.D.N.Y.1972), Tortorello's motion to suppress certain evidence obtained by electronic surveillance pursuant to the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. (1970). Other subordinate claims of error are raised by Tortorello.

We affirm.

## I.

### THE FRAUDULENT SCHEME

In view of the chief issue raised on appeal, a summary description of the fraudulent scheme and conduct for which Tortorello was convicted will suffice. Essentially the evidence established that Tortorello participated in a complicated scheme to resurrect a defunct Texas corporation, Underwriters Investment Company (UIC), to recapitalize the company so that millions of new UIC shares were authorized, to cause the company to acquire assets with apparent but no real value, and to cause the company to dispose of thousands of unregistered, worthless UIC shares to the public.

Tortorello's participation in the scheme was limited to distributing the almost worthless UIC shares. He and an associate, Fred Hesse, were provided by the principals of UIC, Peters and McKinney, with blank UIC stock certificates. They used several nominees to pledge these worthless securities as collateral for loans from various banks. This tactic proved largely unsuccessful. They then arranged for the nominees to sell the securities to various brokerage houses by deceptively creating a demand for the securities.

■ There was a great deal of evidence adduced at the ten day trial which established Tortorello's role in the fraudulent scheme. The evidence of course must be viewed in the light most favorable to the government at this stage of the case. United States v. D'Avanzo, 443 F.2d 1224, 1225 (2 Cir.), cert. denied, 404 U.S. 850 (1971). With the exception of his claim regarding an asserted defense of good faith, Tortorello does not challenge the sufficiency of the evidence.

Tortorello's involvement in the scheme eventually was discovered through the interception of wire and oral communications, to which we now turn.

## II.

### THE ELECTRONIC SURVEILLANCE

The sequence of events with respect to the electronic surveillance here involved may be briefly summarized.

On June 2, 1969, an application was made by the New York County District Attorney's office to Justice Schweitzer in the New York County Supreme Court for an eavesdropping order to intercept conversations and to tap telephone lines at the offices of the Rio Coin Corporation (hereinafter the "Rio Coin Shop") and of Jacob Maishlish (also known as Jack Mace), both located at 1147 Avenue of the Americas, New York City. The application was based on information that Mace might be dealing in stolen property and forged instruments. An order was granted on June 2 authorizing eavesdropping at the Rio Coin Shop premises. Upon application by the District Attorney, six renewal and extension orders subsequently were granted for the same premises. Tortorello was named in the applications and orders as one of the persons whose conversations were to be intercepted. The eavesdropping ended on November 22. It had continued for 173 days.

On December 9, 1969, the New York County District Attorney's office applied to Justice Schweitzer for an order per-

---

five year terms of imprisonment on each of the six counts and fined him a total of $10,000. He has been enlarged on bail pending this appeal.

We have not been informed as to what sentence was imposed on defendant Den-

nett, although we are told he has appealed from his conviction. Nor have we been informed as to the status of the cases against the seven defendants other than Tortorello and Dennett.

mitting the police to tap two telephones at Todd Associates (one of the "Todd Associates" being described as "Arthur Tortorello, also known as Artie Todd"), 120 West 44th Street, New York City, and to place an overhearing device on the premises. The application was supported by an affidavit of Lawrence Hochheiser, an Assistant District Attorney, which incorporated by reference the earlier Mace applications and orders, described incriminating conversations which had been intercepted at the Rio Coin Shop, and contained other information which had been obtained by law enforcement officers through other investigative means. Pursuant to this application, an order was granted on December 10 authorizing officers to seek evidence of the crimes of Burglary, Forgery as a felony, Possession of Forged Instruments as a felony, Possession of Forgery Devices, Grand Larceny in the First Degree, Criminal Possession of Stolen Property in the First Degree and Conspiracy to commit such crimes. These crimes were more particularly identified in the supporting affidavit which was incorporated by reference in the order. Upon application by the District Attorney, five renewal and extension orders were obtained for the same premises. Each successive affidavit described the progress of the investigation. Conversations concerning fraudulent securities transactions unexpectedly were disclosed by the surveillance. The surveillance team thereupon notified federal authorities. Representatives of the SEC and the Joint Strike Force joined the surveillance team. This eavesdropping and wiretapping ended on May 8, 1970. It had been in operation for 149 days.

A substantial portion of the evidence against Tortorello at the trial of the instant case in the district court resulted from this eavesdropping and wiretapping.[2] Tortorello moved to suppress such evidence, claiming that the orders were improperly applied for, granted, renewed, and executed. After a post-verdict hearing, Judge Pollack filed a detailed, well reasoned opinion on May 18, 1972 denying the motion. United States v. Tortorello, 342 F.Supp. 1029 (S.D.N.Y. 1972).

### III.

### CONSTITUTIONALITY OF TITLE III

Tortorello contends that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. (1970) (the Act), is unconstitutional on its face.

■ This claim was not brought to the attention of the trial court. We nevertheless shall consider the constitutional issue raised since it affects "substantial rights". Fed.R.Crim.P. 52.

Those portions of Title III which are germane to this appeal may be briefly summarized. The Act defines the circumstances under which interception of wire or oral communications[3] may be authorized by a state. Section 2516(2) provides that, upon application by the "principal prosecuting attorney" of a state or a political subdivision thereof, a state judge "may grant in conformity with section 2518 of this chapter and with the applicable State statute" an order authorizing interception of wire or oral communications to obtain evidence of certain enumerated offenses.[4] Sec-

---

2. Several witnesses other than the surveillance officers also testified against Tortorello, but they merely repeated conversations which had been obtained pursuant to the eavesdropping and wiretapping. The district court concluded that "if the eavesdrop evidence was illegally obtained, the verdicts must be set aside." 342 F. Supp. at 1032.

3. Referred to in this opinion colloquially as "wiretaps" or "eavesdrops".

4. The offenses specified are "murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, . . . or any conspiracy to commit any of the foregoing offenses." 18 U.S.C. § 2516(2).

tion 2516(2) requires that a state statute authorizing the interception by law enforcement officers of wire or oral communications must contain certain minimal safeguards, in conformity with Section 2518, against intrusion upon rights protected by the Fourth Amendment.

On May 26, 1969, the State of New York enacted Chapter 1147 of the Laws of 1969, effective June 26, 1969, which harmonized New York law with the Act. N.Y.Crim.Proc.Law, art. 700 (McKinney 1971). The New York statute virtually tracks the language of Title III.

■ The threshold question is whether Tortorello has standing to challenge the constitutionality of Title III. The wiretapping and eavesdropping orders involved in this case were applied for by a state district attorney and were issued by a state judge authorized by state law to approve the interception. The state statute clearly conforms to the Act with regard to the procedures for obtaining a valid order. If it did not, the order of course would be unlawful even though authorized by state law. But the Act itself does not authorize a state judge to issue a wiretap or eavesdrop order upon application of a state officer, nor does it require that a state enact empowering legislation.

■ We nevertheless conclude that Tortorello has been directly affected by Title III. Were it not for the Act, the evidence uncovered by the state's electronic surveillance would not have been admissible in the instant federal action. This would have been so because of the Supreme Court's decision in Benanti v. United States, 355 U.S. 96 (1957). *Benanti* involved Section 605 of the Federal Communications Act which prohibited the interception and use of wire communications without prior authorization from the sender. The Court held that wiretap evidence obtained by state officers under sanction of state law, but in violation of Section 605, could not be used in a federal court. See Schwartz v. Texas, 344 U.S. 199 (1952). Since the evidence here was intercepted by state officers, with some participation by federal officers, it could not have been used in the district court below without the authorization provided by Title III. See Section 2517(1) and (3). We hold that Tortorello has standing to challenge the constitutionality of the Act.[5]

The crux of Tortorello's argument challenging the constitutionality of the Act is that the procedures provided by Section 2518 for obtaining a wiretap or eavesdrop order suffer from the same constitutional infirmities as those provided for in the former New York electronic surveillance statute which was invalidated by the Supreme Court in Berger v. New York, 388 U.S. 41 (1967). Tortorello also relies on Katz v. United States, 389 U.S. 347 (1967), where another electronic surveillance was held to violate the Fourth Amendment. *Berger* and *Katz* did not hold, however, that all electronic surveillance is prohibited by the Fourth Amendment. They merely held that the wiretaps and eavesdrops involved in those cases were infected with certain faults which rendered them unconstitutional.

In *Berger,* the grounds upon which the statute was held unconstitutional were as follows:

(1) The statute failed to require a showing of probable cause that a particular offense had been or was being committed.

(2) The statute failed to require that a description be provided of the particular conversations or communications to be intercepted.

(3) The statute failed to require particularity as to the duration of the intrusion. The Court held that

5. Since the procedures followed by the officers in this case were those of the state, it is the state law, and not the federal prohibition of more lenient procedures, that actually is before us. We therefore conclude that in actuality the constitutional attack is on the New York statute and we shall decide the question on that basis.

the intrusion should not be so long as to be "the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause". 388 U.S. at 59.

(4) The statute failed to require particularity as to when a surveillance should be ended after the particular conversation sought was intercepted. As to this, the Court held that discretion should not be vested in the executing officer.

(5) The statute failed to provide for either notice to the persons whose conversations were to be intercepted or a showing of special facts or exigent circumstances necessitating the withholding of notice.

388 U.S. at 58–60.

In *Katz*, where the eavesdropping officers had exercised great restraint and had limited their intrusion, the Court restated the requirements of *Berger,* but with special emphasis on the necessity for a showing of probable cause *before an independent judicial officer* who also would establish the precise limits to be observed in executing the eavesdropping order.

The Act represents an attempt by Congress to establish a limited system of electronic surveillance within the guidelines of *Berger* and *Katz.* Section 2518 obviously was drafted with these decisions in mind. We are satisfied that the Act does comply with the guidelines established by the Court in *Berger* and *Katz.* An examination of the relevant sections of the Act shows that they provide for particularity in the application and order, judicial supervision, and other protective procedures whose absence caused the Court to condemn the electronic surveillance in *Berger* and *Katz.*

Judicial supervision, emphasized in *Katz*, is guaranteed. An application for a wiretap must be made to a judge, Section 2518(1), who may require additional testimony or documentary evidence in support of the application, Section 2518 (2), and who must make specific findings of probable cause before authorizing the interception. Section 2518(3).

There must be particularity in the application and order. An application must contain a "full and complete statement of the facts relied upon by the applicant to justify his belief" that an order should issue. Section 2518(1)(b). Such statement must include details of the particular offense suspected, a particular description of the facilities from which communications are to be intercepted, a particular description of the type of communications sought to be intercepted, and the identity of the person or persons suspected. Section 2518(1)(b)(i)–(iv). Section 2518(4) likewise provides that the order shall specify, among other things, all of the above details.

Tortorello argues that one deficiency in particular found in the statute involved in *Berger*—that the permissible intrusion was so long (60 days) as to amount to a series of searches—also is present in the Act here involved. We disagree. Section 2518(1)(d) requires the application to specify the period of time for which the intercept is required; and, if necessary, facts sufficient to justify continued interception after the particularly described type of communication has been first obtained. Authorization may be no longer than necessary to achieve the objective and in no event longer than 30 days. Section 2518(5). The order must specify the time period for which the intercept is authorized and whether it will automatically terminate when the described communication is first obtained. Section 2518(4)(e). Moreover, Section 2518(5) permits an unlimited number of extensions but only upon a separate showing of probable cause for each extension; and, to obtain an extension, the application must show what has resulted thus far *or* an explanation of why there have been no results. Section 2518(1)(f). We hold that these provisions so limit the length of the intrusion as to satisfy the requirements of *Berger.*

Tortorello also contends that the Act confers unduly broad discretion on the executing officer as to when the surveillance should end—contrary to *Berger*. The provisions of the Act referred to above, however, clearly circumscribe the discretion of the officer, as required by *Berger*. In addition, Section 2518(6) empowers the issuing judge to require periodic progress reports of the surveillance so that the executing officer's discretion may be further circumscribed.

■ Finally, Tortorello contends that the Act does not provide an adequate mechanism for notice of the surveillance. Notice prior to electronic surveillance of course would negate its usefulness. But the Court has long been critical of secret searches. See Gouled v. United States, 255 U.S. 298, 305 (1921). Electronic surveillance cannot be justified unless other methods of investigation are not practicable. Accordingly, the Act expressly requires that the application contain a statement as to whether other investigative procedures have been attempted or why they would be doomed to failure or would be too dangerous. Section 2518(1)(c). Before authorizing the surveillance, the judge must determine that such other procedures have failed, or would fail if tried, or would be too dangerous. Section 2518(3)(c). Moreover, in order to minimize the secretiveness of electronic surveillance, Section 2518(8) requires the recording of all intercepted communications, the preservation of them by the authorizing judge, and no-

tice by the judge to the persons named in the order within a reasonable time after termination of the order—in no event later than 90 days.

In light of the foregoing, we conclude that the Act has carefully provided for judicial supervision of the surveillance, particularly in the applications and orders, and for limits on the duration of the intrusion—the requirements to which the Court attributed constitutional significance in *Berger* and *Katz*.

The Supreme Court has indicated that electronic surveillance is violative of the Fourth Amendment where certain safeguards are absent. It has not fully specified, however, under what circumstances a wiretap or eavesdrop is *not* objectionable. The only recent decision in which the Court explicitly approved an eavesdrop was Osborn v. United States, 385 U.S. 323 (1966).[6] There a man informed the Department of Justice that an attorney had initiated a discussion with him concerning the possibility of his approaching a juror in a pending criminal case. The informant executed a written statement under oath. The Department of Justice then obtained court approval to wire the informant for sound at his next meeting with the lawyer. When the recorder failed to operate at the first meeting, judicial approval was obtained for its use at the next meeting. One conversation was recorded and introduced as evidence. The Court held that the use of the recording device was permissible, and affirmed the conviction.

---

6. With only one exception, so far as we know, those courts which have considered the constitutionality of Title III uniformly have upheld it. United States v. Cox, 449 F.2d 679 (10 Cir. 1971), cert. denied, 406 U.S. 934 (1972); United States v. Focarile, 340 F.Supp. 1033 (D.Md.1972); United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971); United States v. King, 335 F.Supp. 523 (S.D.Cal.1971); United States v. Lawson, 334 F.Supp. 612 (E.D.Pa.1971); United States v. Becker, 334 F.Supp. 546 (S.D.N.Y.1971); United States v. Perillo, 333 F.Supp. 914 (D.Del. 1971); United States v. Leta, 332 F. Supp. 1357 (M.D.Pa.1971); United States v. Scott, 331 F.Supp. 233 (D.D.C.

1971); United States v. Cantor, 328 F. Supp. 561 (E.D.Pa.1971); United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla. 1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla.1970). The *Scott* and *Escandar* opinions, in particular, contain well-reasoned discussions of the constitutional issue.

The only decision of which we are aware that holds the Act unconstitutional is United States v. Whitaker, 343 F.Supp. 358 (E.D.Pa.1972), which was reversed in United States v. Whitaker, 474 F.2d 1246 (3 Cir. 1973), on the basis of the court's earlier decision upholding the constitutionality of Title III in United States v. Cafero, 473 F.2d 489 (3 Cir. 1973).

■ While the Act permits electronic surveillance wider in scope and longer in duration than that held constitutional in *Osborn*, it does not suffer from the infirmities that the Court found fatal to the statute in *Berger* and to the surveillance in *Katz*. We decline to add to the constitutionally imposed requirements set forth in those decisions. We therefore hold that Title III is not unconstitutional on its face.

## IV.

### INTERCEPTION OF TORTORELLO'S CONVERSATIONS AT THE RIO COIN SHOP

Tortorello contends that the Rio Coin Shop orders were invalid because they named him as a person whose conversations were to be intercepted although the applications failed to show probable cause for believing that he had committed or was about to commit a crime. No contention is made that probable cause was lacking as to Jack Mace, who also was named in the Rio Coin Shop orders as one whose conversations were to be intercepted.

The government argues that it did not have to show that Tortorello had engaged in or was about to engage in criminal activity. It maintains that as a general principle it is not required to establish probable cause as to all participants in a conversation before it can intercept a particular conversation. If there is probable cause as to one of the parties to a conversation, so the argument goes, incriminating statements made by another party to the conversation can be intercepted and used even though probable cause is not established as to him. Some courts have upheld this principle. They have held that, since the identity of all persons who may contact or be contacted by the suspect usually cannot be known, it is permissible to record pertinent conversations involving parties not named in the interception order. United States v. King, 335 F.Supp. 523, 539 (S.D.Cal. 1971); United States v. Perillo, 333 F. Supp. 914, 920–21 (D.Del.1971); United States v. Sklaroff, 323 F.Supp. 296, 325 (S.D.Fla.1971).

■■ We are in general agreement with these decisions. In our view the government need not establish probable cause as to all participants in a conversation. If probable cause has been shown as to one such participant, the statements of the other participants may be intercepted if pertinent to the investigation. Clearly there was probable cause to intercept Mace's conversations. Tortorello does not contend otherwise. The government therefore was entitled to intercept the incriminating statements of Tortorello where Mace was involved in the conversations and to use such statements to support an application for electronic surveillance of Tortorello.

This determination, however, does not end our inquiry. Tortorello also was named in the Rio Coin Shop orders as a person whose conversations were to be intercepted. Certainly the interception of conversations in which Mace took part would not be rendered invalid by the fact that there may not have been probable cause to name Tortorello in the orders. But surveillance agents overheard and recorded conversations between Tortorello and third persons. These conversations along with other evidence were included in the affidavits in support of the applications for electronic surveillance of Todd Associates. It might be conceivable that, if there was no probable cause to overhear the conversations of Tortorello with third persons in executing the Rio Coin Shop orders, there was no probable cause for the Todd Associates surveillance.

■ We find it unnecessary, however, to decide whether there was probable cause to name Tortorello in the Rio Coin Shop orders. No testimony concerning, nor recordings obtained from, the Rio Coin Shop surveillance were introduced at trial. Moreover, conversations between Tortorello and third persons intercepted as a result of the Rio Coin Shop surveillance were not used as leads to evidence adduced at trial. The progress reports for the Rio Coin Shop surveillance set forth conversations *by Mace* with Tortorello which clearly indicated

that Tortorello was involved in the handling of stolen goods. These progress reports were used to establish probable cause for the Todd Associates orders. Also used was a tape, secured through the use of a confidential informant, which revealed that Tortorello had agreed to sell the informant a stolen "piece of stock" in the amount of $10,000. It is clear that there was sufficient probable cause based upon lawfully intercepted conversations to support the issuance of the orders to intercept Tortorello's conversations at Todd Associates. Tortorello's conversations with third persons at the Rio Coin Shop or on the Rio Coin Shop telephone were not crucial to probable cause for the Todd Associates orders.

Accordingly, we hold that there was probable cause for the Todd Associates warrants.[7]

## V.

### DISTRICT ATTORNEY'S FAILURE TO APPEAR IN PERSON BEFORE THE ISSUING JUSTICE

Tortorello contends that the electronic surveillance orders were improperly applied for because Honorable Frank Hogan, the New York County District Attorney, did not appear in person before the issuing Justice. This contention is based upon a construction of Section 2516(2) of the Act and Section 794 (now N.Y.Crim.Pro.Law § 690.35) of the New York Code of Criminal Procedure.

The relevant facts may be briefly summarized. Assistant District Attorney Hochheiser was assigned to the Rio Coin Shop and Todd Associates cases. In that capacity he supervised the investigations of Mace and Tortorello. He prepared all of the eavesdrop application papers. These papers were presented to Mr. Hogan himself who gave each application, with one exception, his personal attention.[8] After conferring together and reviewing the application in each instance, both Mr. Hogan and Mr. Hochheiser swore to their respective affidavits before a notary public.

In each instance, Mr. Hochheiser's affidavit stated the factual basis for issuance of the interception order being applied for and the belief that the evidence sought could not be obtained except by the eavesdrops or wiretaps sought. Mr. Hogan stated in his affidavit that he had read the Hochheiser affidavit, that based on it he believed there was probable cause for the electronic surveillance sought, and that no practical alternative means of obtaining the evidence existed. Mr. Hogan was the named applicant for each of the electronic surveillance orders.

The application and supporting affidavits in each instance were submitted to Justice Schweitzer by Mr. Hochheiser who was present to answer any questions the Justice might wish to ask before deciding whether to issue the order. Mr. Hogan never appeared in person before Justice Schweitzer. Mr. Hochheiser did not swear to his affidavit a second time before the Justice.

 Sections 2516(1) and (2) of the Act designate, respectively, the federal

---

7. The quantum of probable cause required under Title III has been considered by a number of courts, including ours. United States v. Poeta, 455 F.2d 117, 121–22 (2 Cir.), cert. denied, 406 U.S. 948 (1972); United States v. Kleve, 465 F.2d 187, 190–93 (8 Cir. 1972); United States v. LaGorga, 336 F.Supp. 190, 193 (W.D.Pa. 1971); United States v. King, 335 F.Supp. 523, 532–37 (S.D.Cal.1971); United States v. Becker, 334 F.Supp. 546, 549–50 (S.D.N.Y.1971); United States v. Leta, 332 F.Supp. 1357, 1361–62 (M.D. Pa.1971); United States v. Scott, 331 F.

Supp. 233, 242–44 (D.D.C.1971); United States v. Cantor, 328 F.Supp. 561, 565–68 (E.D.Pa.1971); Dudley v. United States, 320 F.Supp. 456, 458–60 (N.D.Ga.1970); United States v. Escandar, 319 F.Supp. 295, 304 (S.D.Fla.1970).

8. The one exception was a renewal application which, in Mr. Hogan's temporary absence, was presented to the Acting District Attorney, Alfred J. Scotti, who executed the authorizing affidavit. No contention is made that this invalidated the order based on such application.

and state officials authorized to apply for eavesdrop and wiretap orders.[9] Section 2516(2) provides that the state's "principal prosecuting attorney" or the "principal prosecuting attorney of any political subdivision thereof" "may apply" for an interception order. We find nothing in that provision to require the personal appearance of the "principal prosecuting attorney" before the issuing state judge.

A report of the Senate Judiciary Committee, which contained a comprehensive analysis of the Act, set forth the purpose of requiring that a state or local "principal prosecuting attorney" apply for the order:

> "The intent of the proposed provision is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officers of the State [where state attorney general authorizes the application] . . . . The intent of the proposed provision is to centralize areawide law enforcement policy in [the county district attorney]." S.Rep.No.1097, 90th Cong., 2d Sess. 10 (1968), quoted in 2 U.S.Code Cong. & Adm.News 2112, 2187 (1968).

It appears that this provision was designed to encourage state and local law enforcement officials—the "principal prosecuting attorneys"—to determine whether a particular proposed use of electronic surveillance would be consistent with the overall policy respecting monitoring which had been followed in the state or area. Approval by the prosecuting attorney of an application for electronic eavesdropping essentially is one of policy. As one court has put it,

"the greater the degree of public responsibility attributable to the executive making the initial determination of approval, and the higher his public visibility, the greater is the likelihood that he will be called to account for errors in administration of policy and that the safeguards of the federal statute will be effective." United States v. Lanza, 341 F.Supp. 405, 408 (M.D.Fla.1972).

█ The objective of the provision can be effectively attained by having the chief prosecuting officer pass on applications which his assistants prepare and, after he has approved them, having them presented to the issuing judge. That objective will not be furthered by requiring the chief prosecuting officer to appear personally before the issuing judge. His assistants usually are in a better position to answer questions concerning probable cause, the only practical justification for requiring a personal appearance. Indeed, it would be practically impossible for a district attorney in a county as large as New York County personally to make all the appearances that Tortorello's reading of Section 2516(2) would require. There is no support in either the language or purpose of Section 2516 (2) for such requirement.

█ The Act of course does not preclude a state from requiring its principal prosecuting officers to appear personally before the issuing judge. Tortorello contends that New York has imposed this requirement in Section 794 (now N.Y. Crim.Pro.Law § 690.35) of the New York Code of Criminal Procedure as interpreted in People v. Ricken, 29 App.Div.2d 192, 287 N.Y.S.2d 118 (3d Dept.1968), aff'd, 27 N.Y.2d 923, 266 N.E.2d 821, 318

---

9. Tortorello argues that different procedures are called for because of language differences betwen Section 2516(1) and Section 2516(2) dealing, respectively, with federal and state interception orders. The requirement for federal applications is that the Attorney General "authorize" an application, while the requirement for state applications is that the "principal prosecuting attorney . . .

may apply" for an order. We decline to attribute to this language difference the significance claimed by Tortorello. The purpose of both sections is the same. The report of the Senate Judiciary Committee referred to below, S.Rep.No.1097 at p. 98, paraphrases § 2516(2) in such a way as to indicate that there is no difference in substance.

N.Y.S.2d 142 (1970). Section 794 provided in relevant part:

"The person seeking the warrant shall appear personally before the judge, justice or magistrate who may, before issuing the warrant, examine, on oath, the person seeking the warrant and any witnesses he may produce, and must take the affidavit or deposition of the person seeking the warrant."

In *Ricken*, the police officer who sought a search warrant swore to his affidavits before a notary public. Another police officer appeared before, and presented them to, the issuing Justice. The court held that the warrant was invalid because the applicant, there the police officer apparently most knowledgeable about the factual grounds for the application, did not personally appear.

Tortorello contends that, since the applicant under Section 2516(2) is the "principal prosecuting officer", he is required by Section 794 personally to appear.[10] We disagree. The issue is not what "the attorney . . . authorized . . . to make application" means in the federal statute but what "[t]he person seeking the warrant" means in Section 794. It seems clear from the language of the New York statute and the *Ricken* decision that the purpose of requiring the appearance of the "person seeking the warrant" is to enable the court to question him as to exactly what he is seeking and why he believes that he is entitled to seek it. These questions can be answered best by the person who has had close contact with the case and whose affidavit recites facts believed to establish probable cause. He is the "person seeking the warrant".

A person such as District Attorney Hogan who merely reviews the application to determine whether, as a matter of policy, the electronic surveillance should be undertaken would not be in the best position to answer such questions. We conclude that Section 794 did not require the personal appearance of Mr. Hogan before the issuing Justice.

## VI.

### PARTICULARITY IN THE APPLICATIONS AND ORDERS

Tortorello next contends that the electronic surveillance of Todd Associates was unlawful because the applications and orders lacked sufficient particularity as to the offenses to be investigated and the communications to be intercepted.[11]

The first Todd Associates application, dated December 9, 1969, described the subject offenses as "the acquisition and distribution of stolen negotiable instruments and documents and acts or crimes in furtherance of such acquisition and distribution" (Paragraph 17). It sought to intercept conversations "relative to the commission" of these acts and crimes (Paragraph 19), which it was alleged would "constitute evidence of the crimes of Burglary, Forgery as a felony, Possession of Forged Instruments as a felony, Possession of Forgery Devices, Grand Larceny in the First Degree, Criminal Possession in the First Degree and conspiracy to commit said crimes" (Paragraph 17).

In earlier paragraphs reciting facts for the purpose of establishing probable cause, the offenses suspected and the particular conversations sought to be intercepted were more fully detailed.

10. Tortorello hints that the application may have been improper under state law since the affidavits were sworn to before a notary public rather than before the issuing Justice. No authority is cited for such proposition and we know of none. The critical requirement is that the affiant with knowledge of the facts on the issue of probable cause shall appear before the issuing Justice. To require that he swear to his affidavit a second time before the Justice, would be a meaningless formality.

11. We find it difficult to ascertain from Tortorello's brief whether both the Rio Coin Shop and Todd Associates surveillances are challenged on this ground. Although we discuss only the Todd Associates applications and orders, our conclusions with respect thereto apply also to the corresponding papers relating to the Rio Coin Shop surveillance.

These facts were based on the affidavits in support of the seven Rio Coin Shop orders,[12] conversations recorded as a result of the Rio Coin Shop wiretaps and eavesdrops, and information obtained by law enforcement officers through other investigative activities. They showed that Tortorello was engagng in a highly organized interstate business of receiving and distributing stolen property (Paragraph 7). His specialty appeared to be stolen securities. The affidavit alleged his association with persons known to be dealing in stolen securities and other forms of stolen property (Paragraphs 8, 10, 11, 12, 13). It detailed two specific transactions in which he personally engaged in the distribution of stolen securities (Paragraphs 10A, 14). The affidavit described a telephone call to Tortorello from a known member of the underworld in which they discussed getting together for a "deal".

Subsequent applications for renewal and extension orders followed the same basic form as the first application. The later applications added to the list of offenses the crimes of acquisition, distribution or use of counterfeit negotiable instruments and fraudulently obtained or stolen airline tickets. These offenses were added when evidence of their commission was discovered. Such evidence was set forth in the applications. Reports on the evidence produced by the electronic surveillance were included in the supporting affidavits.

The conversations to be intercepted and the offenses to which they related were not fully described within the four corners of the orders. In his first order, for example, Justice Schweitzer found that there were reasonable grounds to believe that evidence of "the crimes of Burglary, Forgery as a felony, Possession of Forged Instruments as a felony, Possession of Forgery Devices, Grand Larceny in the First Degree, Criminal Possession of Stolen Property in the First Degree, and conspiracy to commit said crimes" might be obtained by authorizing the electronic surveillance. He incorporated the supporting affidavit in his order. He then authorized interception of communications "as described and delineated in paragraph 19 of the herein incorporated affidavit". Paragraph 19 of the affidavit, as indicated above, referred back to paragraph 17 which capsulized the suspected offenses and referred generally to the factual recitations throughout the affidavits detailing Tortorello's criminal activities. The end result was an authorization by the court to intercept wire or oral communications pertaining to the type of criminal activities extensively described in paragraphs 7, 8, 10, 11, 12, 13 and 14 of the supporting affidavit and summarized in paragraph 17. All the renewal and extension orders followed the same format.

■ Particularity in an eavesdrop or wiretap application and order is critical to the constitutionality of a surveillance. The Fourth Amendment does not permit law enforcement officers to engage in lengthy surveillance of a suspected, or even a known, criminal regarding his associations and areas of legal and illegal operations, in the hope of obtaining evidence of some unspecified crime. The Act prohibits such "strategic intelligence surveillance"[13] by requiring, among other measures, that the application identify the particular offense suspected and the particular conversations anticipated. Section 2518(1)(b) requires that the application set forth a full and complete statement of facts "as to the particular offense that has been, is being, or is about to be committed" and "a particular description of the type of communications sought to be intercepted". Each order authorizing an interception is required to set forth

---

12. In Paragraph 7 of the Todd Associates application, the orders and supporting affidavits pertaining to the Rio Coin Shop surveillance were incorporated by reference.

13. Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of Law and Order, 67 Mich.L.Rev. 455, 468–72 (1969).

"a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates". Section 2518(4)(c). These provisions undoubtedly were prompted by the Supreme Court's decisions in Berger v. New York, *supra*, and Katz v. United States, *supra*. See S. Rep. 1097, 90th Cong., 2d Sess. 13 (1968), quoted in 2 U.S.Code Cong. & Adm.News 2112, 2190 (1968).

A difficult question is the degree of particularity required by the Fourth Amendment and Title III. Tortorello contends that the intrusion can be no less precise and discriminate than that approved in Osborn v. United States, *supra*. As stated above, the Act clearly permits a surveillance broader in scope than that in *Osborn*. But the exact boundaries of a constitutionally valid electronic surveillance thus far have not been delineated.

Some guidance, however, has been provided by decisions concerning the particularity of a wiretap or eavesdrop authorized under Title III. In United States v. Scott, 331 F.Supp. 233 (D.D.C. 1971), the affidavits recited that certain known and unknown persons were involved in a "narcotics wholesale trafficking" conspiracy. Specific offenses were alleged to have been committed by certain members of the conspiracy which involved narcotics wholesaling. The type of communications sought to be intercepted were conversations between persons in certain specified cities and states which would reveal the details of a scheme to smuggle narcotics into the United States, to transport them to the Washington, D.C. area, and to distribute them there. The order found probable cause to search for evidence pertaining to "the importation and transportation of narcotics in violation of section 174 of Title 21 of the United States Code." It authorized interception of communications concerning the date and the manner in which narcotic drugs would be smuggled into the United States. The court held that the application and order satisfied the requirements of Sections

2518(1)(b) and (4)(c), respectively. 331 F.Supp. at 241–42.

In United States v. Mainello, 345 F. Supp. 863 (E.D.N.Y.1972), the applications specified that the communications sought to be intercepted concerned "offenses in violation of Article 225, Sections 225.0 through 225.40, New York State Revised Penal Law." 345 F.Supp. at 872. The orders specified that oral and wire communications pertaining to these offenses could be intercepted. As in the instant case, the conversations to be intercepted were more particularly described in the orders and applications in establishing probable cause. The court held that the particularity requirements of the Fourth Amendment and Title III had been met. Other courts have reached a similar result. See, e. g., United States v. Escandar, 319 F.Supp. 295, 302–04 (S.D.Fla.1970); United States v. Leta, 332 F.Supp. 1357, 1359–60 (M.D.Pa.1971); United States v. King, 335 F.Supp. 523, 537–38 (S.D.Cal. 1971).

 These decisions demonstrate that a pragmatic approach has been taken with respect to the particularity requirement. A specific crime or a specific series of related crimes must be identified. Although the nature and type of the anticipated conversations must be described, the actual content need not and cannot be stated since the conversations have not yet taken place at the time the application is made and it is virtually impossible for an applicant to predict exactly what will be said concerning a specific crime. United States v. Sklaroff, 323 F.Supp. 296, 307 (S.D.Fla. 1971). The order must be broad enough to allow interception of any statements concerning a specified pattern of crime. In determining whether the order and application are sufficiently particular, the papers as a whole must be considered, including especially those portions which recite facts intended to establish probable cause.

 The district court in the instant case held that there was no substance to Tortorello's claim that the applica-

tions were not sufficiently particular. 342 F.Supp. at 1036. We have carefully reviewed all the applications. We are satisfied that none of them disclosed an improper intention on the part of the applicant to secure a roving commission. Certain paragraphs in each application succinctly stated the offenses being investigated and the communications sought. Other paragraphs, primarily addressed to probable cause, further defined the relevant criminal activity. The applications sought to intercept only those conversations relating to the pattern of criminal conduct fully described. While the descriptions of offenses were somewhat broad, they were no more so than was necessary under the circumstances. It was alleged that Tortorello had directly participated in or had had contact with a wide variety of crimes. We hold that, taken as a whole, the applications described the suspected offenses and the conversations sought to be intercepted with the degree of particularity required by the Fourth Amendment and Section 2518(1)(b).

 The validity of the orders turns upon the validity of the applications. Justice Schweitzer relied upon the applications to describe with particularity the communications to be intercepted and the related offenses. It would have been better if he had stated in the orders themselves more precisely what those authorized to execute the orders were entitled to overhear and record. But he did incorporate the affidavits into the orders, and we have held that the affidavits set forth a particular description of the conversations sought to be intercepted and the offenses to which they related. The judge in effect fully approved the scope and purpose of the surveillance as delineated in the application papers. A restatement of what was contained within the application papers therefore was not essential.

We hold that the orders were sufficiently particular.

## VII.

### AMENDMENT OF ORDERS

 Tortorello claims that the eavesdrop and wiretap orders were invalid for failure to amend them as required by New York law to include reference to the securities fraud offenses for which he was indicted by a federal grand jury.[14] He argues that all the communications overheard, both before and after an amendment was required, should have been suppressed.

Section 2517(5) of the Act provides that unanticipated intercepted conversations may be used in a criminal proceeding under these circumstances:

> "when authorized or approved by a judge of competent jurisdiction where such a judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable." [15]

Section 825.4 (now N.Y.Crim.Pro.Law § 700.65) of the New York Code of Criminal Procedure provided essentially the same amendment procedure to permit the use in a criminal proceeding of communications unexpectedly intercepted "when a justice amends the eavesdropping warrant to include such contents." See People v. DiLorenzo, 69 Misc.2d 645, 651–52, 330 N.Y.S.2d 720, 724–27 (Sup.Ct. 1972). It is undisputed here that no formal hearing was held to amend the orders after the surveillance team discovered evidence of securities fraud involving Underwriters Investment Company (UIC). The issue is whether it was enough for the law enforcement officers to inform Justice Schweitzer in the supporting affidavits for renewal and extension of the orders that they had

---

14. While this claim also was not raised in the district court, we nevertheless shall consider and rule upon it, since it affects substantial rights. See Section III of this opinion, p. 771 *supra.*

15. For a decision upholding the constitutionality of Section 2517(5), see United States v. Cox, 449 F.2d 679, 683–87 (10 Cir. 1971), cert. denied, 406 U.S. 934 (1972).

intercepted certain conversations dealing with the fraudulent UIC scheme.

The procedure followed here may be briefly stated. Affidavits in support of each of the renewal and extension orders set forth the progress of the investigation. They included a day to day summary of the conversations overheard and events witnessed by the surveillance team. During surveillance under the second Todd Associates order, effective from January 9 to February 8, 1970, the first conversation relating to UIC was intercepted. In the very next affidavit, that which led to the February 9 order, it was indicated that these conversations had occurred. Additional information derived from the electronic surveillance concerning the UIC scheme was reported in the affidavit in support of the March 10 order. Finally, in the affidavit in support of the April 8 order, after the contours of the scheme had been discovered, all the information that had thus far been obtained was presented to the court in a detailed description of the fraudulent scheme, including in relevant part the following:

"The conversations intercepted since February 1970 as set forth herein and in the affidavit in support of the Order of March 10, disclose that Tortorello, Hesse and their co-conspirators were planning a large-scale securities fraud involving the stock of Underwriters Investment Company. . . ."

The provisions of the orders remained basically the same after discovery of evidence pertaining to the UIC stock fraud. They stated that there was probable cause with respect to the same types of offenses, including Grand Larceny; they incorporated by reference the supporting affidavits; and they referred to those affidavits for a more particular description of the offenses and conversations to be intercepted.

■ The New York statute, Section 825.4, is controlling on this issue. The legislative history of Section 2517(5) of the Act, which is substantially identical to the New York provision, furnishes some illumination as to the reasons for requiring an amendment procedure:

"Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." S.Rep. 1097, 90th Cong., 2d Sess. 12 (1968), quoted in 2 U.S.Code Cong. & Adm.News 2189 (1968).

Where the electronic surveillance is to continue, and law enforcement officers wish to intercept additional communications relating to accidentally-discovered criminal activity, the amendment procedure also provides an opportunity for the court to indicate in the renewal order that conversations relating to such criminal activity may be intercepted.

■ The government maintains in the instant case that, on the basis of the information set forth in the supporting affidavits, the issuing justice was able to and did in fact determine that the original application was not a subterfuge; that it was made in good faith; and that communications with respect to the UIC scheme were incidentally intercepted during the course of a lawfully executed order. It further contends that there was no need to amend the provisions of the order, since there was no crime under state law specifically dealing with stock fraud[16] (this being encom-

---

16. Moreover, it may be that amendment was not required by New York law under the circumstances of this case. The New York Commission on Revision of Penal Law and Criminal Code, in a memorandum to the predecessor statute, indicated the type of situation intended to be covered by the provision for amendment:

"Section 822 relates to a situation where, in the course of executing a valid eavesdropping warrant . . . ., the applicant or his designated agent unexpectedly overhears an incriminating

passed by the crime of Grand Larceny [17]) and since the affidavits which were incorporated by reference in the orders clearly indicated the specific crimes to be investigated. We agree.

Neither the New York statute nor the Act requires the issuing judge to announce formally in open court that he has noticed the interception of evidence not covered by the original order and has determined that it was properly obtained. It is enough that notification of the interception of evidence not authorized by the original order be clearly provided in the renewal and amendment application papers. A judge presumably will scrutinize any application and will scrupulously impose the restrictions required by statute. The orders here, by referring to the affidavits for a description of offenses and communications to be intercepted, were amended as the contents of the affidavits changed.

We hold that the amendment requirements under New York law were satisfied.

### VIII.

#### EXECUTION OF ORDERS

Tortorello also contends that the manner in which the wiretaps and eavesdrops were executed resulted in unnecessary monitoring and recording of many irrelevant conversations in violation of the Fourth Amendment. He further contends that this violated those provisions of the orders requiring minimal interception of nonpertinent communications. Relying on United States v. Scott, 331 F.Supp. 233, 247–48 (D.D.C.1971), he argues that all the intercepted conversa-

tions were inadmissible, even though most of them may have been properly overheard. We disagree.

Section 2518(5) of the Act, in order to prevent unnecessary intrusion into the privacy of the surveillance target, provides in relevant part that:

"Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception. . . . "

All the Todd Associates orders included a provision in compliance with this section. The question raised here is whether the executing officers took reasonable measures to minimize the interception of irrelevant communications.

The officers charged with executing the interceptions, relying on what strikes us as good judgment, devised certain basic guidelines for determining whether a conversation should be monitored and recorded. Among the considerations taken into account were the identity of the caller, the guarded nature of the conversation, and the timbre of the voice of the speaker. Children's conversations were not recorded. With regard to the subject matter of the conversations, those relating, for example, to stocks and bonds, letters of credit, buying controlling interests in corporations, and the making of loans usually were intercepted. Conversations relating to meetings, conferences, and money dealings often were recorded. As soon as it was determined that any conversation overheard was not pertinent, all interception immediately ceased.

---

conversation that is *totally unrelated* to the crime for which the warrant was issued." (emphasis added). McKinney's 1968 Session Laws of New York, Memorandum 2293, 2296.

The "crime for which the warrant was issued" here was the acquisition and distribution of *stolen* securities. The conversations overheard related to the acquisition and distribution of *fraudulent* securities. It might be said that the two crimes are not "totally unrelated".

17. In United States v. Grant, 462 F.2d 28 (2 Cir. 1972), we held that the definition of "larceny" in Section 155.05(2) of the New York Penal Law "was sufficiently broad to encompass" the violations of the federal securities laws involved therein. 462 F.2d at 33. We reach the same conclusion with regard to the securities frauds and registration violations involved in the instant case, which were similar in many respects to those involved in *Grant*.

On one occasion, the officers were eavesdropping on a pertinent conversation when a non-pertinent telephone call occurred; both the eavesdrop and the wiretap were immediately shut off.

The district court examined the daily records or line sheets and heard the testimony of the detectives who monitored the Todd Associates conversations. In holding that "genuine and acceptable safeguards" were taken to minimize the interception of non-pertinent conversations, the court observed:

> "Obviously, some non-pertinent items crept in because they were recorded before a determination of their relevancy could be made. Other such items were included because they appeared in conversations also containing pertinent items. Still others represented a determination of pertinence with which the Court does not necessarily agree. However, overall, the excess items were *de minimis* and the compliance reasonably conformed to adequate rules set down for the intercept." 342 F.Supp. at 1038.

Some indication of what constitutes proper minimization measures can be gleaned from recent decisions involving a challenge to the execution of surveillance orders. In United States v. Scott, *supra,* all conversations were overheard and recorded. After examining the surveillance team's log sheets, the court determined that only 40% of the conversations in fact were relevant, that from introductory remarks it could have been determined that many were irrelevant, and from experience with certain calls it could have been ascertained that many others were irrelevant. In short, the court found that there was no attempt by the officers to devise some means of limiting interception. It therefore suppressed the evidence obtained from all the conversations.

In United States v. King, 335 F.Supp. 523, 540–42 (S.D.Cal.1971), every communication that came across the tapped wire was recorded, regardless of who the parties were or what they were discussing. It was estimated that ninety percent of the phone calls were monitored by the surveilling agents. The court, in rejecting the government's contention that all conversations had to be monitored in their entirety because there was a chance that something relevant might turn up, stated:

> "[I]t could satisfy itself with information received from conversations falling more easily within the classes which the statute requires to be particularly described. This means that if after a certain amount of time has elapsed a conversation still appears innocent, the Government would cease interception out of respect for the parties' constitutional rights and for the limited system which Congress so painstakingly created. An exception to this might be phone calls between known conspirators which may be intercepted in their entirety due to the strong possibility that the conversation may take a relevant turn." 335 F.Supp. at 542.

In United States v. Sklaroff, 323 F. Supp. 296, 316–17 (S.D.Fla.1971), the court held that those responsible for executing the orders had successfully minimized interceptions. Thirty-two calls not involving persons named in the orders were not recorded. Of nine personal calls, one was not recorded at all, two were partially recorded, and six were completely recorded. The court found that a minimal number of personal calls were intercepted. It held that on the whole the officers had acted properly in executing the orders.

It is clear from these decisions that a court should not admit evidence derived from an electronic surveillance order unless, after reviewing the monitoring log and hearing the testimony of the monitoring agents, it is left with the conviction that on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion.

We agree with the district court here that the detectives who conducted

the Todd Associates surveillance established and observed reasonable guidelines in limiting their intrusion. By considering the nature of the persons conversing and the subject of the conversations, they reasonably limited interception to communications which were likely to be relevant. They also halted all interception as soon as the conversation appeared to be non-pertinent, even if it meant not hearing simultaneously a pertinent conversation.

We hold that the officers respected the privacy of the persons under surveillance and utilized effective safeguards against excessive intrusion.

## IX.

### DEFENSE OF GOOD FAITH

Finally, Tortorello contends that the trial judge failed properly to instruct the jury on his defense of good faith. On the conspiracy count, the jury was charged that Tortorello could not be convicted unless "he knew what the unlawful purpose was" and unless he "entered into the conspiracy with the specific criminal intent . . . purposely intending to violate the law." Similarly, on the other counts, the court carefully and fully charged that Tortorello could not be found guilty unless the jury determined that he was aware of the fraudulent nature of the transactions and specifically intended to violate the law. We hold that the charge, taken as a whole, properly instructed the jury on the issue of criminal intent which was essential to Tortorello's defense of good faith.

We have carefully considered Tortorello's other claims and find them to be without merit.[18]

Affirmed.

---

18. Counsel for Tortorello urges, by letter addressed to the Court subsequent to the argument, that we reverse on the basis of our recent decision in United States v. Birrell, 470 F.2d 113 (2 Cir. 1972). In *Birrell*, we did indicate our disapproval of the practice of postponing suppression hearings until after trial, particularly where the issue is the legality of a search or seizure which does not require a preview of the government's case as in a taint hearing. 470 F.2d at 115. The thrust of our suggestion, however, was not that such postponement would be a ground for reversal. Rather, we intended to warn the government that, if the result of the postponed hearing were adverse, it might not be permitted to retry the defendant even though the untainted evidence would be sufficient to support a conviction. Tortorello's reliance on *Birrell* for reversal of his conviction is misplaced.