**UNITED STATES of America,**
**Appellee,**

v.

**M. Perry GRANT and Service Securities,**
**Inc., Appellants.**

**No. 577, Docket 71–2198.**

United States Court of Appeals,
Second Circuit.

Argued March 9, 1972.

Decided May 25, 1972.

Jerome J. Londin, New York City Allen Green and Kenneth A. Lapatine (Carro, Spanbock & Londin, New York City, on the brief), for appellants.

Franklin B. Velie, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., Daniel J. Sullivan and Ross Sandler, Asst. U. S. Attys., New York City, on the brief), for appellee.

Before FRIENDLY, Chief Judge, TIMBERS, Circuit Judge, and JAMESON, District Judge.*

TIMBERS, Circuit Judge:

Appellants M. Perry Grant and Service Securities, Inc. ("Service"), of which Grant is the 50% owner and president, were convicted after a nine day jury trial in the District Court for the Southern District of New York, Lloyd F. MacMahon, *District Judge*, of conspiring to violate and of violating the antifraud provisions of the federal securities laws, 15 U.S.C. §§ 77q(a), 77x, 78j(b) and 78ff (1970), and the mail fraud statute, 18 U.S.C. § 1341 (1970). On the five counts upon which they were convicted, the trial judge sentenced Grant to concurrent terms of imprisonment of six months on each count, and fined Service $1.00 on each count. On appeal, appel-

---

* Senior District Judge of the District of Montana, sitting by designation.

lants contend that the indictment [1] was tainted by unlawful wiretapping; that a recording of a telephone conversation was improperly admitted against them; that the government's summation deprived them of a fair trial; and that the "free-rider" clause of the prospectus was not misleading. For the reasons stated below, we affirm.

## I.

The evidence presented at trial established that Grant, operating through Service, a securities broker dealer, and in conjunction with J. L. Patterson, the president of Data Industries Corporation of Texas, Inc. ("Data"), and others, defrauded public investors in connection with an offering of a new issue of Data stock.

In December 1968, Data and Amos Treat and Company agreed that Treat would underwrite a public offering of Data shares. In the Spring of 1969, however, Treat announced that its own business reversals would prevent it from completing work on the offering. Patterson and the other backers of Data began looking for another underwriter.

In April 1969, defendant Nasar, a shareholder of Data who was one of Data's promoters, introduced Patterson to defendant Alpert, an employee of A. T. Brod & Co. Alpert in turn arranged for a meeting between Patterson and appellant Grant. Thereafter Grant and Service agreed to underwrite the Data offering.

An amendment to the registration statement naming Service as under-writer was filed. The revised prospectus falsely represented Nasar as the sole finder and the finder's fee as $12,500 and a like number of warrants. Grant realized that the prospectus failed to disclose that Alpert was the true finder and that the finder's fee was to be $24,500 plus warrants, as Alpert was to receive $12,000 and a like number of warrants for his services.

The Data prospectus indicated that the offering of 150,000 shares for $8.50 per share was on a best-efforts-all-or-nothing basis. The registration statement became effective on August 18, 1969. Under the terms of the offering, if all 150,000 shares were not sold by October 17, 1969, sixty days after the effective date, all the money collected would be returned to the investors who had ordered shares.

The new issue of Data stock was not fully subscribed by September 1969. Moreover, outstanding orders were being cancelled daily. Grant and Patterson, a co-conspirator but not a defendant, recognized that drastic action was required to insure that the issue would be fully subscribed by the October 17 deadline.

In the first week of October, Grant devised a scheme for completing the sale of all 150,000 shares. The scheme was essentially as follows: Friends and associates of Grant were induced to participate in the Data offering by Grant's guaranteeing them against loss. To make it appear as though all of the remaining shares had been purchased, Grant then would place orders in fictitious names or in the names of real per-

---

1. The 23 count indictment was filed on June 29, 1971. Count 1 charged Grant, Service, Ronald Alpert, Leon Nasar and Charles Karp with conspiring to violate the antifraud provisions of the securities laws and the mail fraud statute in connection with the offer and sale of shares of stock of Data Industries Corporation of Texas, Inc. ("Data"). The 22 substantive counts charged each of the defendants with fraud in connection with the public offering and sale of Data stock in violation of the federal securities laws and the mail fraud statute.

Trial of appellants Grant and Service began on October 18, 1971. All counts except 1, 2, 3, 21 and 22 were withdrawn or dismissed at the close of the government's case. On November 1, 1971, the jury found Grant and Service guilty on all five counts.

Ronald Alpert's trial was severed because he was scheduled to be tried in another case at the same time. Defendants Karp and Nasar pleaded guilty to Counts 13 and 1, respectively, and testified for the government at trial.

sons who did not intend to pay for the Data shares. The "successful" completion of the offering would permit public trading of Data shares in the over-the-counter market. Grant's nominees and friends would then sell their shares in this "after-market". It would be Patterson's job to arrange sufficient buying in the after market so that the fictitious orders placed by Grant would be "crossed out"—offset by purchases in the after market—and not have to be paid for.

The success of Grant's scheme depended on carefully orchestrated buying and selling through a cooperating wholesale broker in the over-the-counter market. Patterson's buying in the after market would be placed, timed and priced to match Grant's selling of the Data shares which allegedly had been purchased during the public offering. The wholesale broker would match up or cross out the Grant sales with the purchases Patterson generated in the after market. The "sellers" thus would receive money to pay for the shares they had ordered. Moreover, by maintaining the market price above the offering price, subscribers to the offering would not cancel their orders, and additional persons might be induced to subscribe.

The payment for Patterson's buying in the after market was to be delayed by having the buyers request delivery of shares at their banks before payment would be authorized. Grant then promised that he would cross out Patterson's purchases by arranging for the sale of the shares to public investors.

To initiate this scheme, Grant caused a telegram to be sent on October 4, 1969 to members of the selling group, falsely declaring the issue fully subscribed.

On October 8, public trading in Data shares began. On October 9, Grant sent Patterson a list of the names of persons whose orders for shares in the underwriting were to be crossed out by Patterson's purchases in the after market. At Grant's daily direction, Patterson caused his friends and associates to place orders for Data shares in the market at prices, times and with over-the-counter wholesale dealers designated by Grant.

On October 16, the closing of the offering was held, even though Grant and Patterson knew that not all of the 150,000 shares had been purchased and that not all of the proceeds had been received.

In the period following the closing, Patterson and his friends were not able to sell the Data shares purchased by them in the after market. As a result, some 50,000 shares of the 150,000 offered ended up in the hands of Patterson and his associates. Some of these purchases were ultimately financed by loans arranged by Patterson through Data.

## II.

Appellants' first contention is that their convictions must be reversed on the ground that the indictment was the product of unlawful electronic surveillance. Since we hold that the wiretapping and "bugging" were legal, we do not reach the question of whether the electronic surveillance tainted the indictment.

The facts surrounding the allegedly unlawful eavesdropping are as follows. On July 17, 1969, the New York County District Attorney secured the first of a series of orders permitting his agents to intercept and record telephone conversations relating to alleged criminal activities by Charles "Ruby" Stein and Nicholas "Jiggs" Forlano. Neither of these persons nor their activities relate in any manner to the instant indictment or to Grant. The wiretapping continued for several months as authorized by court ordered extensions of the initial warrant. On September 26, 1969, as a result of information obtained from the Stein wiretap, the New York County District Attorney secured an additional order to permit wiretapping of two telephones listed to Charles Karp, a co-defendant in the instant case. On October

10, 1969, New York Supreme Court Justice Schweitzer issued an order authorizing the interception and recording of oral communications in Karp's apartment. Upon a showing of probable cause, Justice Schweitzer renewed the eavesdropping warrants in October, November and December, 1969 and in January, 1970. Over this entire period a vast number of conversations between Karp and other persons were overheard and recorded. Virtually all of this material had no bearing on this case. On several occasions, however, conversations between Grant and Karp relating to the Data offering were intercepted and recorded.

Appellants advance five theories to support their claim that the wiretapping and "bugging" were unlawful under state law. Only two of these theories, however, were presented in a timely fashion to the district court. In a pre-trial motion to dismiss the indictment and suppress evidence, appellants contended that New York law does not authorize more than one extension of eavesdropping warrants and does not permit eavesdropping in the investigation of the crimes charged here.

■■■ The three remaining arguments upon which appellants rely to show the illegality of the electronic surveillance were raised for the first time after trial. In a post-trial motion to acquit or, alternatively, to grant a new trial, appellants claimed that the failure to notify Grant that his conversations had been intercepted made the eavesdropping unlawful. In their brief on appeal, appellants raised a fourth argument for illegality—the failure to name Grant and Service in the warrants. Finally, appellants argued for the first time in their reply brief that there was no probable cause for the issuance of the Stein and Karp surveillance warrants.[2] Appellants' failure to make these three surveillance arguments in a timely fashion constitutes a waiver of their objection to the indictment based on these arguments. Fed.R.Crim.P. 12(b)(2). See United States v. Garnes, 258 F.2d 530, 534–35 (2 Cir. 1958), cert. denied, 359 U.S. 937 (1959); 1 Wright, Federal Practice and Procedure 406–07 (1969). In any event, we have considered these arguments and find them to be without merit.[3]

■■■ As for the two arguments pressed in the pre-trial motion, it is clear that they cannot carry the day for appellants. The suggestion that the extensions of the warrants were unlawful under New York law is frivolous. Section 821 (now N.Y.Crim.Pro.L. § 700.40)[4] of the New York Code of Criminal Procedure provides in relevant part:

"Any time prior to the expiration of an eavesdropping warrant, the applicant may apply to the issuing justice, or if he is unavailable, to another justice, for an order of extension. The period of extension shall be no longer than the justice deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days . . . ."

Neither this section nor any other section of the eavesdropping statute limits the number of extensions which may be sought, as long as each extension is

2. Grant's objection to the repeated renewals of the warrants did not effectively raise the issue of lack of probable cause. Moreover, the statement in the post-trial motion affidavit that "[a]t no time did the prosecution furnish sufficient cause for interception of Grant's conversation . . . ." is too far off the mark from the issue of probable cause with respect to Karp and Stein.

3. In addition to appellants' brief on appeal, reply brief and oral argument, we have considered the affidavit and memorandum of law submitted in support of their motion for leave to reargue the appeal, which we denied on April 4, 1972.

4. Effective September 1, 1971, the sections of the New York Code of Criminal Procedure pertaining to eavesdropping were repealed and reenacted without substantive change in sections 700 et seq. of the New York Criminal Procedure Law.

sought in the prescribed manner and does not exceed 30 days in length. Moreover, the present New York eavesdropping statute was enacted in 1969 with the intention that it conform to the federal statute, which had been enacted the previous year. United States v. Poeta, 455 F.2d 117, 119 n. 5 (2 Cir.), cert. denied, 406 U.S. 1948 (1972). The federal statute · specifically states that "[e]xtensions of an order may be granted . . . ." 18 U.S.C. § 2518(5) (1970). There is no reason to believe that the New York statute was intended to be any different in this respect.

■ Appellants' claim that the New York eavesdropping statute does not authorize surveillance in the investigation of the crimes charged here also is without merit. Section 815 (now N.Y.Crim. Pro.L. § 700.10) of the New York Code of Criminal Procedure permits eavesdropping with respect to certain designated offenses. These are defined in § 814(8) (now § 700.05(8)) to include conspiracy to commit any enumerated offense, and among the enumerated offenses are various degrees of larceny. The definition of "larceny" contained in § 155.05(2) of the New York Penal Law is sufficiently broad to encompass the conduct involved in this case.

### III.

We also reject appellants' contention that the district court erred in admitting against them a tape recording of a telephone conversation between Karp and Patterson.

The evidence adduced at trial established that Karp authorized Grant to purchase shares for him in the underwriting at $8.50 per share, as long as Grant would guarantee to cross out his order by a purchase in the after market. While Grant never purchased shares for Karp in the offering, Grant did place in Karp's name an order for 2,000 Data shares at $11 per share in the after market. When Karp learned that 2,000 shares had been ordered in his name, he confronted Grant, who told him that

Patterson had placed the order. On October 17, 1969, Karp made the telephone call to Patterson which was recorded and admitted in evidence against appellants. During the conversation, Karp and Patterson discussed ways of completing the 2,000 share transaction without upsetting the scheme and without imposing an unwanted liability on Karp.

■ In view of the purpose of the telephone conversation, the recording was properly admitted in evidence under the co-conspiracy exception to the hearsay rule. There was ample independent non-hearsay evidence to show that Patterson and Karp were conspirators with Grant in the scheme to defraud public investors. See United States v. Calabro, 449 F.2d 885, 889 (2 Cir. 1971); United States v. Geaney, 417 F.2d 1116, 1119 (2 Cir.), cert. denied, 397 U.S. 1028 (1969). Furthermore, it is clear that Karp's telephone call to Patterson was made in furtherance of the conspiracy. The purpose of the telephone call was to devise a means of disposing of the 2,000 shares which Grant had ordered in Karp's name. Thus, the telephone conversation comprised a series of statements by two co-conspirators in furtherance of the conspiracy.

■ It is quite true that not all of the statements made during the course of the lengthy telephone conversation could be said to have been in furtherance of the conspiracy. The trial judge did not err, however, in admitting all of the conversation, in spite of the well established rule that mere conversation between conspirators which is not in furtherance of the conspiracy is not admissible under the co-conspiracy exception to the hearsay rule. See United States v. Birnbaum, 337 F.2d 490, 495 (2 Cir. 1964); United States v. Nardone, 106 F.2d 41, 43 (2 Cir.), rev'd on other grounds, 308 U.S. 338 (1939). To exclude· those statements which were not considered to be in furtherance of the conspiracy would have resulted in a disjointed conversation which might have

confused the jury. Accordingly, since the telephone call itself was made in furtherance of the conspiracy, we believe the entire conversation was admissible under the doctrine of completeness. See United States v. Agueci, 310 F.2d 817, 834 (2 Cir. 1962), cert. denied, 372 U.S. 959 (1963); United States v. Lev, 276 F.2d 605, 608 (2 Cir.), cert. denied, 363 U.S. 812 (1960); United States v. Corrigan, 168 F.2d 641, 645 (2 Cir. 1948); Wigmore on Evidence §§ 2094, 2115 (3d ed. 1940).

At trial appellants' principal objection to the recording was that Karp's statement that he knew Grant had placed the 2,000 share order was inadmissible, as it contradicted Karp's trial testimony and the government could not impeach its own witness. The trial judge properly rejected this argument. Karp did not testify that he believed Patterson had placed the order. Rather, Karp testified that Grant told him that Patterson had placed the order. Thus there was no inconsistency between Karp's trial testimony and his statement to Patterson during the telephone conversation, and we need not consider whether appellants' argument would have merit if there had been.

### IV.

Appellants also argue that the government's summation deprived them of a fair trial, claiming that the summation was based on an erroneous chart and that the prosecutor misrepresented the evidence adduced at trial.

A government chart purporting to show all trades in Data stock in the over-the-counter market in October 1969 was admitted in evidence at trial subject to revisions pursuant to agreement of counsel. The chart was a compilation of other documents and charts previously stipulated into evidence. The prosecutor referred to this chart several times during his summation. Thereafter defense counsel represented to the court that the chart had been changed beyond what was agreed to by counsel. Noting that any agreement about revising the chart had not been made on the record, the trial judge struck the exhibit and the prosecutor's comments relating to it. The court then instructed the jury to disregard the chart "on the ground that it contains too many errors." In support of a post-trial motion for judgment of acquittal, defense counsel filed a lengthy affidavit contending there were additional changes in the chart which he did not realize at trial.

After reviewing the record and the chart, we are convinced that appellants sustained no prejudice as a result of the chart's admission in evidence and the prosecutor's comments about it. The chart was not even inaccurate on the point emphasized by defense counsel. The proof established that Michael Brent, Grant's decorator, "purchased" 2,000 Data shares in the offering at $8.-50 per share and that Karp "purchased" 2,000 Data shares in the after market at $11 per share. The government showed that Grant was the moving force behind these transactions, that both Karp and Brent were in effect nominees for Grant, and that through these transactions Grant created a $4,153 profit for himself which he used to reduce his loan account at his bank. The chart reflected the sale of 2,000 shares at 10¾ to Austin, James & Co. from an account in the name of Michael Brent and the purchase of 2,000 Data shares at $11 per share from an account in the name of Charles Karp from Austin, James & Co. The chart also represented both trades as occurring on October 13, 1969. While there was some evidence that Karp's purchase occurred on the previous business day, this possibility was indicated in a footnote to the chart. In any event, the important fact was Grant's attempt to "cross out" the purchases by his nominees in the offering. That the trades reflected in the chart may have occurred on different days has little bearing on the government's case against appellants.

The other alleged inaccuracies in the chart are insignificant. Appellants have

not even indicated how these alleged errors deprived them of a fair trial.

■ Appellants' contention that the prosecutor argued unfairly about Brent's signature on a letter likewise is without merit.

Michael Brent testified at trial that he acted as a nominee for Grant who bought and sold shares in his name. Brent stated that he signed many documents at Grant's request, but was unable to recall the circumstances under which he had signed all of them. Brent further testified that Grant had opened an account for him with Howard Dolman at Scheinman, Hochstin & Trotta.

After Brent had finished testifying, a letter signed by Brent ordering 2,000 Data shares was found in the government's files. Appellants neither recalled Brent for cross-examination nor requested that Brent be recalled by the government or the court. Rather, defense counsel introduced this letter in evidence through Virginia Diodato, a defense witness. Defense counsel then argued in summation that the initials at the bottom of the letter indicated that it had been prepared at Scheinman, Hochstin & Trotta, not by Grant, and that it was significant that Brent never mentioned this letter in his own testimony. In response, the government argued that if Brent were confronted with the letter, his answer would be that he could not remember the circumstances surrounding his signing that particular letter.

■ In view of Brent's testimony that he signed many documents at Grant's request under circumstances which he could not recall, the prosecutor's argument was fair comment on what inferences the jury might draw from the evidence. Moreover, the trial judge properly denied appellants' request to instruct the jury that Brent would have testified that Grant had nothing to do with the preparation of the letter. Appellants could have recalled Brent to question him about the letter. In light of their failure to do so, they were not entitled to a favorable instruction on what inferences the jury should draw from the letter signed by Brent.

■ Appellants' argument that the prosecutor's statement about Patterson's gun sales was unfair is equally unpersuasive. During cross-examination, Patterson admitted that he had sold eight pistols to a man from New York who later told Patterson that he had used them once and disposed of them. There was no testimony as to when this sale occurred. Patterson also testified that he had agreed to cooperate with the government in the prosecution of this case. Defense counsel argued during summation that Patterson should not be believed because he sold guns to criminals. The government countered with the argument that "[y]ou don't know whether [the sale] happened before he was cooperating with the Government or after." While it subsequently appeared that only six of the eight pistols were bought and then sold by Patterson when he was cooperating with the government, there is no reason to believe that the prosecutor knew this fact at the time of summation. Accordingly, under the facts then known to him, the prosecutor's statement was fair comment on appropriate inferences to be drawn from the evidence.

Appellants also contend that the government engaged in unfair argument in stating to the jury that neither Karp nor Patterson were ever shown to have lied under oath. This claim is frivolous. Appellants' contention that Karp and Patterson lied to various people during the investigation is not supported by the record. Karp's and Patterson's testimony at trial was not inconsistent in any material respect from what they had said on previous occasions. Moreover, defense counsel had adequate opportunity during exhaustive cross-examination and summation to place before the jury what he considered to be prior inconsistent statements, thus fairly presenting the issue of credibility to the jury.

**36**

## V.

Finally, appellants contend that the district court misconstrued the meaning of the "free-rider" clause of the Data prospectus.

The Clause in question reads in relevant part as follows:

"An amount not to exceed 10,000 of the shares will be offered on the effective date at the public offering price to friends, employees and others having business relationships and personal relationships with the Company or its principal Stockholders, Directors or Officers. Persons to whom shares are so offered will be obliged to purchase such shares immediately upon this offering becoming effective and pay for them within 4 business days thereafter . . . ."

The government argued in summation that "friends, employees and others" had purchased more than 10,000 shares by the closing date of the offering and that the prospectus was therefore materially misleading in that the clause quoted above had represented that only 10,000 shares would be sold to such people. Over defense counsel's objection, the court instructed the jury that the government contended that the prospectus was misleading in that "it represents that no more than 10,000 shares of Data stock would be offered to friends, employees and others having to do with the company and its principal shareholders when, in fact, approximately 50,000 shares were sold to that class of persons."

It is clear that the district court misinterpreted that clause of the prospectus relating to sales of Data shares to friends, employees and others having a business relationship with Data and its officers. This provision was designed to limit the number of shares offered to friends of the company for only a twenty-four hour period beginning with the effective date of the offering. The purpose of this type of provision is to satisfy the NASD and SEC bar against insiders purchasing all the shares of a "hot issue" before the public has a bona fide opportunity to subscribe. See 5 Loss, Securities Regulation 3455–61 (Supp. 1969). The clause in question should not have been interpreted to prevent subsequent purchases by friends and employees of the company if the issue was not fully subscribed after the first day of the offering. Accordingly, the court erred in instructing the jury that they should find the prospectus misleading if friends and employees of the company purchased more than 10,000 Data shares of the offering.

Nevertheless, as noted in Part I of this opinion, the government presented massive evidence showing that appellants had violated the mail fraud statute and the antifraud provisions of the federal securities laws. Thus, we hold that the court's misinterpretation of the "free-rider" clause of the prospectus constituted harmless error.

Affirmed.