UNITED STATES of America,
Appellee,

v.

Lloyd DIXON, Jr., Appellant.

No. 483, Docket 75–1317.

United States Court of Appeals,
Second Circuit.

Argued Nov. 26, 1975.

Decided March 12, 1976.

Herald Price Fahringer, Buffalo, N. Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., of counsel), for appellant.

Robert H. Plaxico, Dept. of Justice, Washington, D. C. (Richard J. Arcara, U. S. Atty., Western District of New York, Robert C. Stewart and Dennis P. O'Keefe, Buffalo, N. Y., Shirley Baccus-Lobel, Washington, D. C., of counsel), for appellee.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

## I.

Appellant Lloyd Dixon, Jr., was the president of AVM Corporation of Jamestown, New York, a manufacturer of voting machines which became subject to the proxy and reporting requirements of the Securities Exchange Act of 1934 (the Act) in 1965 as a result of the addition of § 12(g) in the amendments of 1964. His prosecution arose from violations of those provisions of the Act.

One of these, § 14(a), deals with the solicitation of proxies. It provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to [§ 12] of this title.

Acting under this authority the Securities and Exchange Commission (SEC) has long provided that no solicitation of proxies may be made unless each person solicited is or has been "furnished with a written proxy statement containing the information specified in Schedule 14A," 17 C.F.R. 240.14a–3. Item 7e of Schedule 14A provides in pertinent part:

. . . State as to each of the following persons who was indebted to the issuer or its subsidiaries at any time since the beginning of the last

fiscal year of the issuer, (i) the largest aggregate amount of indebtedness outstanding at any time during such period, (ii) the nature of the indebtedness and of the transaction in which it was incurred, (iii) the amount thereof outstanding as of the latest practicable date, and (iv) the rate of interest paid or charged thereon:

(1) Each director or officer of the issuer;

(2) Each nominee for election as a director; and,

(3) Each associate of any such director, officer or nominee.

*Instructions.* 1. Include the name of each person whose indebtedness is described and the nature of the relationship by reason of which the information is required to be given.

2. This paragraph does not apply to any person whose aggregate indebtedness did not exceed $10,000 or 1 percent of the issuer's total assets, whichever is less, at any time during the period specified. Exclude in the determination of the amount of indebtedness all amounts due from the particular person for purchases subject to usual trade terms, for ordinary travel and expense advances and for other transactions in the ordinary course of business. 17 C.F.R. 240.14a–101.

The other set of provisions requires the filing of reports with the SEC. The basic requirements are laid down in § 13, with the SEC having power to fill in the details. Acting under this authority the SEC has required the filing of an annual report, commonly known as a 10–K report. One item required in such reports is as follows, 17 C.F.R. 210.5–04:

*Schedule II—Amounts receivable from underwriters, promoters, directors, officers, employees, and principal holders (other than affiliates) of equity securities of the person and its affiliates.* The schedule prescribed by § 210.12–03 shall be filed with respect to each person among the underwriters, promoters, directors, officers, employees, and principal holders (other than affiliates) of equity securities of

the person and its affiliates, from whom an aggregate indebtedness of more than $20,000 or 1 percent of total assets, whichever is less, is owed, or at any time during the period for which related income statements are required to be filed, was owed. For the purposes of this schedule, exclude in the determination of the amount of indebtedness all amounts receivable from such persons for purchases subject to usual trade terms, for ordinary travel and expense advances and for other such items arising in the ordinary course of business.[1]

The instant indictment, in the District Court for the Western District of New York, contained six counts. Count II charged that Dixon "did knowingly, wilfully and unlawfully" solicit proxies in violation of the SEC's Rule quoted above, as the proxy statement did not disclose loans to Dixon during the fiscal year ended December 31, 1970, and he was not within the exemption provided for borrowers whose loans at no time exceeded $10,000. Count VI charged that Dixon and the AVM Corporation "unlawfully, wilfully and knowingly" violated § 13 of the Securities Exchange Act by filing a 10–K report for 1970 which omitted to include a Schedule II although such inclusion was required to reflect any loans to insiders which, like Dixon's, amounted to more than $20,000 at any time during the year. Counts III, IV and V charged violations of the mail fraud statute, 18 U.S.C. § 1341,[2] in that on three separate days Dixon "having devised a scheme and artifice to defraud"—a scheme to deny the SEC information to which it was entitled and to solicit proxies in violation of its rules, by reason of the failure of the proxy statement to contain the required information concerning Dixon's indebtedness—effect-

1. The schedule prescribed by § 210.12–03 is the following:

Amounts receivable from underwriters, promoters, directors, officers, employees, and principal holders (other than affiliates) of equity securities of the person and its affiliates.

| Column A | Column B | Column C | Column D | | Column E | |
|---|---|---|---|---|---|---|
| | | | Deductions | | Balance at end of period | |
| Name of debtor [1] | Balance at beginning of period | Additions | (1) Amounts collected [2] | (2) Amounts written off | (1) Current | (2) Not current |

[1] Include in this schedule both accounts receivable and notes receivable and provide in a note hereto pertinent information, such as the due date, interest rate, terms of repayment and collateral, if any, for the amounts receivable from each person named in column A as of the date of the most recent balance sheet being filed.

[2] If collection was other than in cash, explain.

---

2. This provides in pertinent part as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

ed this scheme by taking receipt from the mails of proxies executed by shareholders. Count I, the conspiracy count, under 18 U.S.C. § 371, was a hybrid. An opening paragraph, which charged that Dixon conspired with two unindicted co-conspirators, Kenneth Hammond and William Lewis, to commit offenses against the United States, was followed by two others. The first charged use of the mails and instrumentalities of interstate commerce to solicit proxies by means of an incomplete proxy statement. The second charged an offense as being "to knowingly, wilfully and unlawfully devise a scheme and artifice to defraud the stockholders" of AVM, by making false and fraudulent entries in AVM's books in violation of § 14 of the Securities Exchange Act and the Proxy Rules,[3] in order to deny the stockholders information required by law which was material and necessary to their assessment of the qualifications of officers on whose behalf the proxies were being solicited and that "in furtherance of the scheme and artifice to defraud as aforesaid," Dixon and the co-conspirators received mail matter in violation of the mail fraud statute.

A jury returned a verdict of guilty on all counts. The judge sentenced Dixon to one year's imprisonment on each count, the sentence to be served concurrently, and to fines of $10,000 each on Counts I, II and VI and of $1,000 on Counts III, IV and V.

## II.

The Government presented its case through two witnesses, William Lewis and Robert M. Entwisle, who were respectively AVM's secretary-treasurer and its general counsel at the time here in question. Lewis testified under a grant of immunity.

The proof left no doubt that the highest aggregate balance of loans to Dixon during 1970 substantially exceeded the $20,000 exemption from the 10–K Schedule II filing and the $10,000 exemption from the proxy statement disclosure. His loans from AVM were channeled through two accounts, # 2410–00 and # 2512–02. The 1970 debits to these accounts were:

# 2510–00: $13,800 carryover from 1969
28,000 Jan.
13,000 Apr.
5,000 May
4,000 Feb.
6,500 Oct.
11,000 Oct.

# 2512–02  $ 4,068 carryover.

At the same time, Dixon was paying back sums into the # 2510–00 account, so that by November 30 the confirmation statement reflecting these loans and signed by him to be sent to Ernst & Ernst, the accounting firm doing the AVM annual audit, showed a total debt of $67,868.08 for both accounts. Dixon stipulated that at least $65,368.08 of this was personal debt.

In December 1970, Dixon initiated a number of transactions which gave the appearance that he had retired a large portion of his debt. He instructed Lewis to transfer $9,000 to Dixon's father's account, the elder Dixon being at that time Chairman of the Board of AVM. This transaction had the effect of canceling the February and May debits of $5,000 and $4,000 from the # 2510–00 account. Dixon paid AVM $30,000, which he had borrowed from a Jamestown bank, to be applied to the # 2510–00 account. He then had Lewis take an advance of $5,000 on Lewis' account and apply the money to the # 2510–00 debt. Finally, Dixon retired the # 2512–02 account and paid an additional $700 on the # 2510–00 account. He thus reduced his total indebtedness to $19,100 as of December 31, 1970. Dixon stipulated that $14,600 of this constituted loans used for personal purposes.

As was his practice, Dixon renewed his AVM loans after January 1 and used the monies to pay off the loans from the bank and Lewis by which he had reduced his AVM accounts prior to the year's

---

**3.** It is not clear how the entries could have violated § 14 or the Proxy Rules, whatever else may be said about them; the court gave no charge on that point.

end. Thus on February 1, 1971 he took a fresh $30,000 advance, debited to the # 2510–00 account, and on February 22 used the account to obtain $5,000 with which to repay Lewis. A $300 advance at the end of the month brought the # 2510–00 total back up to $54,400.

The evidence thus established that the proxy statement sent out March 19, 1971 and the 10–K report filed on March 25, 1971 did not contain the information on Dixon's indebtedness that was required. Dixon's principal defense was that he thought the "SEC rules" provided for a $20,000 exemption, determined on the basis of *year-end* indebtedness, rather than by the highest aggregate balance during the year. Since Dixon's year-end balance still exceeded the $10,000 exemption in the proxy rules, it seems, although the record and briefs are not altogether clear on this, that the defense encompassed an assertion that Dixon thought a $20,000 year-end balance was the test for exemption from both rules. A principal reason for the lack of clarity was that Dixon, exercising his constitutional privilege, did not take the stand; instead his counsel sought to elicit the evidence of Dixon's state of mind by cross-examining Lewis and Entwisle.

The most important exculpatory item was testimony by Lewis that Sam Hale, the Ernst & Ernst account executive, had said "sometime around 1967", probably in connection with the 10–K report, that Dixon's loans had to be reduced below $20,000 by year-end in order to avoid having to file a Schedule II. As against this Lewis testified that at some time Lyons, an AVM financial officer, had given him the correct information and that it was Lewis' practice to pass information regarding the accounts to Dixon. Lewis admitted filing an inaccurate 10–K after this, but the Government did not establish whether this was done for 1970, the period at issue, or for the following year. Although the accountants from Ernst & Ernst were questioned by both sides prior to trial—

and defense counsel claimed that their testimony would establish that Dixon had been misinformed—neither the Government nor the defendant called them as witnesses. The judge properly instructed that an adverse inference could be drawn against either side from failing to do so, *United States v. Beekman,* 155 F.2d 580, 584 (2 Cir. 1946); *United States v. Llamas,* 280 F.2d 392 (2 Cir. 1960); the jury evidently chose to draw it against Dixon.

The preparation of the proxy statement was primarily the work of Entwisle. He would prepare a draft based on such information as he had "and then submit it to Mr. Lewis with a copy to Mr. Dixon for input." The first draft would have, "many, many blanks" which would call for information including a paragraph on "Transactions" which was to disclose those transactions between the officers and employees of AVM and AVM itself; stock options and purchases, salaries and vested retirement benefits, were, for example, included by the AVM staff to be written up in the final copy by Entwisle. But Dixon did not inform Entwisle of the loans; the latter learned of them only in 1972 when a grand jury was investigating possible bribery of municipal officials and Entwisle examined the books.[4] After this, AVM in October 1972 filed an 8–K report with the SEC stating that:

> Due to a misunderstanding of the rule, the Company has failed to report publicly outstanding loans to two of its executives.

Information was also sent to stockholders along with a letter dated January 17, 1973, in which the board of directors declared:

> The Company has been advised by the officers responsible for the preparation of the Proxy Statement and the Annual Report that for the loans and repayments thereof that they had acted in the belief that they were complying with the regulations of the law.[5]

---

4. What became of Dixon's certification to the auditors in November, 1970, was left unexplained.

5. The record is clear that when AVM came under the Securities Exchange Act the SEC furnished it with all regulations and forms per-

### III.

We shall deal first with Dixon's convictions on the two counts, II and VI, of violating the Securities Exchange Act. The failure to include a statement of Dixon's indebtedness in the proxy statement and a Schedule II in the 10–K report were clear violations of "any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter," the language of the first clause of § 32(a). The principal questions before us are whether Dixon was shown to have had the state of mind required for a conviction and whether the jury was properly charged.

In *United States v. Peltz*, 433 F.2d 48, 54–55 (2 Cir. 1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971), we pointed out that in regard to violations of the statute or applicable rules or regulations, § 32(a) requires only willfulness; that the "willfully and knowingly" language occurs only in the second clause of § 32(a) relating to false or misleading statements in various papers required to be filed; that the final proviso that "no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation" shows that "A person can willfully violate an SEC rule even if he does not know if its existence"; and that whatever may be true in other contexts,[6] "willfully" thus has a more restricted meaning in § 32(a). However, since the term must have some meaning,

we held, as the late Judge Herlands wrote in the very year the statute was passed and long before his appointment to the federal bench, the prosecution need only establish "a realization on the defendant's part that he was doing a wrongful act," Criminal Law Aspects of the Securities Exchange Act of 1934, 21 U. of Va.L.Rev. 139, 144–49 (1934); it is necessary, we added, only that the act be "wrongful under the securities laws and that the knowingly wrongful act involve a significant risk of effecting the violation that has occurred."

While evidence was scarcely needed to show that the chief officer of a corporation required to file 10–K reports and issue proxy statements knew that the content of these was prescribed by statute or rule, the testimony of Lewis and Entwisle sufficed to meet any burden the Government had on that score. Indeed, Dixon does not deny his knowledge that there were SEC rules requiring the reporting of loans to officers, of which there clearly was sufficient evidence; his contention is that he was incorrectly informed of their content. As the sentencing minutes show, Chief Judge Curtin believed Dixon knew that the exemptive provisions of those rules were not satisfied by a sufficiently low balance at year-end, however high the figure had previously been. Dixon contends the evidence of the latter was not sufficient to convince a reasonable juror beyond a reasonable doubt, *United States v. Taylor*, 464 F.2d 240 (2 Cir. 1972). Both the factual issue and the question of the effect of a decision on it

tinent to proxy solicitation and reporting requirements. Both sides indulge in extensive reference to attendance by Lewis, Entwisle and Dixon at a PLI seminar on the duties of registered companies; we find this inconclusive. Dixon also relies on a statement which Entwisle testified may have been made by Dixon to Mitchell Rogovin of the Washington, D. C., law firm of Arnold & Porter, after the investigation of the books had occurred, to the effect that he had not known of the provision of the Proxy Rules requiring the disclosure of loans to officers. Mr. Rogovin was not called. Emphasis is also placed on the approval of the language in the letter transmitting the 8–K report by another highly respected Washington

law firm, Wilmer, Cutler & Pickering. No member of that firm was called and we see no force in the matter.

6. As the Supreme Court has pointed out, " '[W]illful' is a word 'of many meanings, its construction often being influenced by its context,' " *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495, 1502 (1945), quoting *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418, 422 (1943). The Model Penal Code would have requirements of "willfulness" satisfied by proof that the person had acted "knowingly." ALI Proposed Official Draft § 2.02 (1962).

favorable to Dixon may be close ones, but we need not resolve them. We do not have here the case of à defendant manifesting an honest belief that he was complying with the law. Dixon did a "wrongful act," in the sense of our decision in *Peltz,* when he caused the corporate books to show, as of December 31, 1970, debts of his father and of Lewis which in fact were his own. True, Dixon may have thought his year-end thimblerig would provide escape from a rule different from the one that existed. But such acts are wrongful "under the Securities Acts" if they lead, as here, to the very violations that would have been prevented if the defendant had acted with the aim of scrupulously obeying the rules (which would have necessarily involved correctly ascertaining them) rather than of avoiding them. Such an intention to deceive is enough to meet the modest requirements of the first clause of § 32(a) when violations occur.

■ However, this is not the end of the matter. Both counts II and VI of the indictment charged that Dixon had "knowingly, wilfully and unlawfully" omitted information about his loans from the proxy solicitation and the 10–K. This was an unfortunate choice of language since, as noted, the first clause of § 32(a), under which Dixon's violations fell, does not use the adverbs "knowingly" or "unlawfully" although the second clause of § 32(a) imposes a criminal sanction on

> any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement . . . which statement was false or misleading with respect to any material fact . . . .

The difference seems to have been deliberate[7] since the second clause covers violations of the Act that involve misrepresentations, see James, Culpability Predicates for Federal Securities Law Sanctions: The Present Law and the Proposed Federal Securities Code, 12 Harv.J. of Legis. 1, 56 (1974); hence the inclusion of the term "knowingly," a concept typically associated with prosecution for acts grounded in fraudulent intent, see e. g., *United States v. Simon,* 425 F.2d 796, 798, 809 (2 Cir. 1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970); ALI Federal Securities Code, Tent.Draft No. 3 § 1517(a)(1). Our decisions in *United States v. Guterma,* 281 F.2d 742, 753 (2 Cir.), *cert. denied,* 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960), and *United States v. Colasurdo,* 453 F.2d 585, 593–94 (2 Cir. 1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972), illustrate the distinction.

The trial judge apparently recognized all this and defined "knowingly" as used in the indictment to be substantially synonymous with "willfully". Thus he told the jury that the standard of proof respecting state of mind was the same for both the proxy and 10–K counts; that "an act is done knowingly if done voluntarily and intentionally and not because of a mistake or accident or other innocent reason"; that "an act is done willfully if done intentionally and deliberately"; and that the "word 'knowingly' means that the defendant must be aware of what he was doing and what he was not doing; the word 'willfully' under [the proxy and 10–K counts] means that the defendant acted deliberately and intentionally and his acts, statements or omissions were not the result of innocent mistake, negligence or inadvertence or other innocent conduct." Such an instruction accords with the standards of the first clause of § 32(a) insofar as it

---

**7.** At least one commentator has suggested that the word "knowingly" in the second clause of § 32(a) is redundant and that "willfully" alone is the operative word, 3 Loss, Securities Regulation 1986–87 (1961). On the other hand there is evidence that some of the legislators active during the Act's passage perceived a distinction between the two terms, see Hearings before the Committee on Interstate and Foreign Commerce, quoted in Herlands, *supra,* 21 U. of Va.L.Rev. at 145–46.

simply collapses "knowingly" into "willfully," and, as we have noted, it was the first clause that set the standard to be applied. The defendant did not object to this instruction at trial, nor does he object here. We do not have the case where an instruction on "knowingly" as that word is used in the second clause of § 32(a) would have been needed and the trial judge read it away, see *United States v. Fields,* 466 F.2d 119 (2 Cir. 1972). We likewise do not have a situation in which a trial judge has "amended" the indictment by restating it so as to allege a violation of federal law different from that charged, see *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), or where instructions to the jury failed to explicate crucial elements of the offense, see *United States v. Howard,* 506 F.2d 1131 (2 Cir. 1974). The word "knowingly" was surplusage in Counts II and VI and in effect the judge treated it as such, see *United States v. Harvey,* 428 F.2d 782, 783–84 (9 Cir. 1970).

▮ Even though Chief Judge Curtin properly read these counts as not requiring a charge on "knowingly" that would have been demanded by the second clause of § 32(a), a further question remains. The instructions that an act is done willfully "if done intentionally and deliberately" and if it is not "the result of innocent mistake, negligence or inadvertence" taken with his statement that the Government was not required to prove a "specific intent on [Dixon's] part to disregard or to disobey the law" were proper so far as they went. We have held in *United States v. Schwartz,* 464 F.2d 499, 509 (2 Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), that

> Proof of a specific intent to violate the law is not necessary to uphold a conviction under § 32(a) of the Act, provided that satisfactory proof is estab-

lished that the defendant intended to commit the act prohibited.

But the instructions may not have been apt to convey that Dixon must be shown to have had *some* evil purpose, as Judge Herlands suggested in his article [8] and as we ruled in *United States v. Peltz, supra.* However, defendant never sought such an instruction. It is true that defense counsel, citing *United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941, 951 (1973), did request that the jury be charged, with respect to Counts II and VI, that "wilfulness, as used in this context, means 'bad faith or evil intent,'" the language in the inner quotes being from *United States v. Murdock,* 290 U.S. 389, 398, 54 S.Ct. 223, 226, 78 L.Ed. 381, 387 (1933). But this request failed to recognize that, as the Supreme Court has observed, the meaning of "willfully" depends upon the context; that the content of § 32(a) of the Securities Exchange Act, to wit, the contrast between the first and second clauses and the clear inference that a person may be convicted (although not imprisoned) for violating a rule of whose existence he is unaware shows that "willful" has less than its ordinary significance in prosecutions for violation of the first clause; and that the requirement would be satisfied by the lesser showing outlined in *Peltz.* No one called the decision in that case to the judge's attention and there is no reason to think he would not have charged in accordance with it if asked. While the exceptions to the charge said that defense counsel "generally except[s] to the Court's refusal to charge any request I have made or in the language I have made," they made no complaint as to the definitions of "willfully" and "knowingly" in the charge of the Securities Exchange Act counts. The principal burden of the exceptions was rather the court's having told the jury "that more is expected and required of a president of a corporation

---

8. "The express requirement of 'willfulness' in § 32 and the seriousness of the possible penalty thereunder warrant the belief that 'guilty intent' will be required for prosecutions under this statute . . . .. And such was the defi-
nition which the Congressional Committee intended the word to have in the present legislation." Herlands, *supra,* 21 U. of Va.L.Rev. at 147–48.

in the way of reasonable investigation than can reasonably be expected of a lesser official"—a thought the judge expressed on other occasions in somewhat different ways. This was not sufficient to apprise the court that the defendant wished to charge in accordance with *Peltz* on the two Securities Exchange Act counts. Nor, when the court's remarks are read in context, can we find error in the portion of the charge to which exception was taken.

## IV.

We find much more difficulty with respect to the convictions under the three substantive mail fraud counts. Dixon urges that the evidence was insufficient to show a violation of the mail fraud statute or a conspiracy to violate it; that in particular there was no sufficient evidence of the specific intent which the judge properly instructed to be an element of these offenses, see *United States v. Klein,* 515 F.2d 751 (3d Cir. 1975), see also Manual on Jury Instruction—Criminal Mail Fraud Offenses, §§ 16.01–16.05, 36 F.R.D. 600 (1965); and that the Securities Exchange Act counts and the substantive mail fraud counts were multiplicitous.

▆▆ We begin by expressing some wonder why the prosecutor [9] thought it necessary or desirable to include the mail fraud counts. Nothing in the descriptive guidelines issued by the Department of Justice would suggest that such a situation is appropriate for § 1341 prosecution, see United States Attorneys' Manual, U.S. Dept. of Justice, 170–73, 178–79 (1971). The head and front of Dixon's offending was a violation of the SEC's Proxy Rules in the 1971 proxy solicita-

tion and of its reporting rules in the 1970 10–K report. If these could be proved, § 32(a) of the Securities Exchange Act, as it then stood, afforded the possibility of four years' imprisonment (unless Dixon could show that he did not know of the rules, which the Government must have known to be hardly possible) [10] and fines of $20,000. This prison sentence was as much as any judge would impose and the Government's burden with respect to criminal intent on the Securities Exchange Act counts was less than under the mail fraud counts. From a practical standpoint all that the mail fraud counts accomplished, or could reasonably have been expected to accomplish, was the collection of additional fines. While it has been said that the mail fraud statute "continues to remain an important tool in prosecuting frauds in those areas where legislation has been passed more directly addressing the fraudulent conduct," *United States v. Maze,* 414 U.S. 395, 406, 94 S.Ct. 645, 651, 38 L.Ed.2d 603, 612 (1974) (Burger, C. J., dissenting), there is no justification in such instances for straining to read it beyond the ordinary meaning of the language.

The mail fraud counts did not rely on the second clause of the mail fraud statute, see note 2 *supra,* relating to any scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses." Clearly Dixon did not do that; what he obtained was an agency to vote. The Government's case on these counts thus must rest on showing sufficient evidence of a "scheme or artifice to defraud" *simpliciter.*

▆▆ While the statute must reach some schemes or artifices to defraud

---

**9.** The prosecution was conducted by the Strike Force for the Western District of New York, apparently because the facts were developed in an investigation of bribes allegedly paid by AVM to municipal officials.

**10.** We read the proviso to § 32(a) as requiring proof that the defendant did not know there was any applicable rule; we would not regard it as satisfied by proof that he did not have accurate information of the content of the rule, *United States v. Lilley,* 291 F.Supp. 989 (S.D. Tex.1968); cf. *United States v. Sloan,* 399

F.Supp. 982 (S.D.N.Y.1975). Although counsel called the proviso to the court's attention at the time of sentence and introduced polygraph evidence to support Dixon's statement at sentencing that he had been unaware of any wrongdoing, he did not offer proof that Dixon was unaware that rules existed. The appeal does not challenge the sentence as such.

The 1975 Securities Act Amendments increased the maximum term of imprisonment under § 32 to five years, 89 Stat. 163.

that do not in themselves involve "obtaining money or property by means of false or fraudulent pretenses," we have been cited to no case, and our research has discovered none, which has sustained a conviction for mail fraud on the basis of nothing more than the failure to mail a correct proxy solicitation where this was not in furtherance of some larger scheme contemplating pecuniary loss to someone or direct pecuniary gain to those who designed it.[11] The Government says, quite correctly (Brief p. 37), that "Mail fraud and securities law violations are frequently joined in a single indictment." But the three cases cited by it, *United States v. Benjamin,* 328 F.2d 854 (2 Cir.), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964); *Sanders v. United States,* 415 F.2d 621 (5 Cir. 1969), *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 26 L.Ed.2d 271 (1970), and *United States v. Ashdown,* 509 F.2d 793 (5 Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47, 44 U.S.L.W. 3201 (1975), involved the sale of securities that were worthless or misrepresented. Other cases where mail fraud counts were added to counts for violation of the securities legislation have typically involved schemes having the potential of pecuniary loss to the victims and gain to the perpetrators, such as to manipulate the price of stock, see, e. g., *United States v. Dioguardi,* 492 F.2d 70 (2 Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); *United States v. Projansky,* 465 F.2d 123 (2 Cir.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); to divert corporate monies, see, e. g., *United States v. Mackay,* 491 F.2d 616 (10 Cir. 1973), *cert. denied,* 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 (1974); *United States v. Koss,* 506 F.2d 1103 (2 Cir. 1974), *cert.*

denied, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975); to sell overvalued unregistered stock, see, e. g., *United States v. Crosby,* 294 F.2d 928 (2 Cir. 1961), *cert. denied,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); *United States v. Dardi,* 330 F.2d 316 (2 Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); to engage in fraudulent practices connected with the sale of stock, see, e. g., *United States v. Grant,* 462 F.2d 28 (2 Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972); or to conceal how serious the financial situation of an issuer had become, see, e. g., *United States v. Simon,* 425 F.2d 796 (2 Cir. 1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). The mere fact that many violations of the securities legislation may also constitute violations of the mail or wire fraud statute does not mean that every violation of the former by use of the mails or wire communications is a violation of the latter.

The Government advances several theories why the proxy violation constitutes a fraud under the mail fraud statute: that it represented a denial of information to the shareholders; that it deprived them of Dixon's "honest and faithful services" as their fiduciary and the president of the company; and that the SEC was obstructed in its work.

There is abundant authority that a scheme to use a private fiduciary position to obtain direct pecuniary gain is within the mail fraud statute, *United States v. Buckner,* 108 F.2d 921, 926–27 (2 Cir.), *cert. denied,* 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940); *United States v. Groves,* 122 F.2d 87 (2 Cir.), *cert. denied,* 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941); *Post v. United States,* 132 U.S.App.D.C. 189, 407 F.2d

11. We are, of course, well aware of our decisions that since the statute requires only a scheme to defraud and not actual fraud "it is not essential that the Government allege or prove that purchasers were in fact defrauded." *United States v. Andreadis,* 366 F.2d 423, 431 (2 Cir. 1966), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); *Farrell v. United States,* 321 F.2d 409, 419 (9 Cir. 1963), *cert. denied,* 375 U.S. 992, 84 S.Ct. 631, 11

L.Ed.2d 478 (1964); *United States v. Shavin,* 287 F.2d 647, 651–52 (7 Cir. 1961); *Hermansen v. United States,* 230 F.2d 173, 174 (5 Cir.), *cert. denied,* 351 U.S. 924, 76 S.Ct. 781, 100 L.Ed. 1455 (1956). But as we said in *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180 (2 Cir. 1970), "this does not mean that the government can escape the burden of showing that some actual harm or injury was *contemplated*" (emphasis in text).

**1400**

319 (1968), *cert. denied,* 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969); *United States v. George,* 477 F.2d 508 (7 Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973). The same principle, of course, applies when the fiduciary occupies a public office. *Shushan v. United States,* 117 F.2d 110 (5 Cir.), *cert. denied,* 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941); overruled on another issue, *United States v. Cruz,* 478 F.2d 408, 412 n. 8 (5th Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973); *Bradford v. United States,* 129 F.2d 274 (5 Cir.), *cert. denied,* 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547 (1942). We thus assume that the use of a deficient proxy statement to obtain approval of a transaction violating fiduciary duty, e. g., the sale of corporate property to a director at what was known to be less than its fair value, would be a violation of the mail fraud statute. Here there is no claim that Dixon violated his fiduciary duties by receiving the loans from AVM. Taken most favorably to the Government, the most that the mail fraud counts of the indictment charged and the proof established was that Dixon willfully failed to carry out an obligation imposed by § 14 of the Securities Exchange Act; that the stockholders executed proxies for the selection of an unopposed management slate of directors without having the information in regard to loans to Dixon to which they were entitled under the Act; and that the directors then reelected Dixon as president. This is a considerable distance from the ordinary meaning of a "scheme or artifice to defraud." Dixon did not deny the loans; he simply failed to report them and only the rare stockholder who was familiar with Schedule 14A of the Proxy Rules would know that this, in effect, was a denial of their existence. There was no evidence that even to such a stockholder the omission would be material, save as the Securities Exchange Act makes it so. In any event Dixon received no money or property by virtue of the omission; while the proxies for the management slate insured his continuation in office, there is no sug-

gestion that selection of that slate was ever in doubt. Although there is some evidence of Dixon's saying that he did not want the loans to be known, he regularly confirmed them to the company's accountants and did not direct that they be concealed but simply omitted them in his response to Entwisle's draft. This effort to avoid disclosure, although a breach of a statutory obligation, was hardly "a scheme or artifice to defraud" in the sense of the mail fraud statute in the context of this case. We have already declined, in the area of private decision making, to follow the letter of Judge Learned Hand's dictum in *United States v. Rowe,* 56 F.2d 747, 749 (2 Cir.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), that "false representations, in the context of a commercial transaction, are per se fraudulent despite the absence of any proof of actual injury to any customer." *United States v. Regent Office Supply Co., supra,* 421 F.2d at 1179–82.

We likewise reject the argument that impairment of the stockholders' opportunity to exercise a full and fair judgment by Dixon's § 14 violation deprived them of his "honest and faithful services," see *United States v. Isaacs,* 493 F.2d 1124 (7 Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146, *reh. denied,* 418 U.S. 955, 94 S.Ct. 3234, 41 L.Ed.2d 1178 (1974), in the sense required to constitute a violation of the mail fraud statute. This doctrine of the deprivation of honest and faithful services has developed to fit the situation in which a public official avails himself of his public position to enhance his private advantage, often by taking bribes. Such actions may not deplete the fisc; indeed, as in *Isaacs,* they may have enriched it, but they are nonetheless frauds since the public official has been paid to act in breach of his duties. Thus the doctrine has been applied to the corruption of a public official with respect to the allocation of insurance commissions although these must, in any case, have been paid by the state to someone, *United States v. Barrett,* 505 F.2d 1091, 1103–05 (7 Cir. 1974), *cert. denied,* 421 U.S. 964, 95 S.Ct.

1951, 44 L.Ed.2d 450 (1975). See also the cases under the portion of the general conspiracy statute, 18 U.S.C. § 371, which makes it a crime to conspire "to defraud the United States, or any agency thereof in any manner or for any purpose . . .." *Haas v. Henkel,* 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910); *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968, 970 (1924); *United States v. Johnson,* 383 U.S. 169, 172, 86 S.Ct. 749, 751, 15 L.Ed.2d 681, 683 (1966); *Miller v. United States,* 24 F.2d 353, 358–59 (2 Cir.), *cert. denied,* 276 U.S. 638, 48 S.Ct. 421, 72 L.Ed. 745 (1928); *United States v. Peltz, supra,* 433 F.2d at 51–52. All these cases, however, involved an element of corruption not present here. We therefore need not consider whether the doctrine of the cited cases should be carried over into the private field, e. g., if, for example, Dixon had bribed Entwisle to put out a proxy statement known to be incomplete.

The Government's final argument is that the SEC was defrauded. The substantive mail fraud counts, III, IV and V, although not the conspiracy count, I, charge that Dixon used the mails to deny the SEC information about the proxy statement to which it was lawfully entitled. Apart from any other considerations, the counts of the indictment which assert this "scheme" claim, as the only unlawful act by which it was effected, that Dixon "did . . . take and receive from the United States Postal Service the falsely solicited proxies." While these acts could have been part of the alleged "scheme" to trick stockholders, receipt of the proxies could not possibly have worked to accomplish the scheme charged to defraud the SEC. We thus need not determine whether, under a properly framed indictment, Dixon could have been convicted for mail fraud under the rationale of *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973, 978 (1966) (false affidavits submitted to NLRB).

When all is said and done, the Government's proof on the mail fraud counts was simply that Dixon had caused the mails to be used to receive proxies solicited by a proxy statement which did not contain the information about loans to Dixon that it should have contained. To hold that this alone constituted a violation of the mail fraud statutes would stretch its words beyond normal bounds; "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493, 497 (1971), quoted and applied in *United States v. Bass,* 404 U.S. 336, 347–49, 92 S.Ct. 515, 522–523, 30 L.Ed.2d 488, 496–497 (1971). We thus do not reach the question whether if the mail fraud statute were otherwise applicable the Government submitted sufficient evidence of specific intent to warrant submission of the three mail fraud counts to the jury, although we would think this very doubtful. And since we are directing dismissal of those counts, we need not consider whether they are multiplicitous. A jury need not be asked to consider, and the Government cannot be required to elect, one of two sets of charges, both of which arise from a single offense, when one such set, here the mail fraud counts, does not charge an offense of which the defendant could be convicted.

### V.

This leaves us with the conspiracy count. Under our analysis the paragraph charging a conspiracy to violate the Proxy Rules stated an offense and the evidence was enough for conviction, but the second paragraph did not provide sufficient basis for conviction of a conspiracy under the mail fraud statute.

In *United States v. Mack,* 112 F.2d 290 (2 Cir. 1940), this court, speaking through Judge Learned Hand, held that where an indictment charged a conspiracy to engage in three offenses and only one was proved, the conviction could still stand. We have recently followed that decision in *United States v. Papadakis,*

510 F.2d 287, 297 (2 Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975), subject to a caveat not here applicable, and in *United States v. Frank,* 520 F.2d 1287, 1293 (2 Cir. 1975). Although in these cases all the objectives charged in the conspiracy count were crimes and the defect was a failure of proof as to some, other circuits have reached the same result when some of the objectives were not crimes, *Moss v. United States,* 132 F.2d 875 (6 Cir. 1943); *United States v. Tanner,* 471 F.2d 128, 140 (7 Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). Although the Seventh Circuit, speaking through Judge Pell, has recently questioned the correctness of this line of authority on the ground that a reviewing court cannot tell what offense or offenses alleged in a conspiracy indictment were found by the jury, *United States v. Baranski,* 484 F.2d 556, 559–61 (1973), here we know from the conviction on Count II that the jury found that Dixon had committed the offense validly charged in the conspiracy count. Cf. *United States v. Bottone,* 365 F.2d 389, 394–95 (2 Cir.), *cert. denied,* 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966); *United States v. Jacobs,* 475 F.2d 270, 282–84 (2 Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 131, 38 L.Ed.2d 53 (1973). There is thus no basis for questioning the conviction on the conspiracy count.

## VI.

The only remaining question is whether we should simply affirm the convictions on Counts I, II and VI or vacate them in order to require the judge to reconsider the sentence of imprisonment. Our review of the sentencing minutes convinces us that the judge's considered determination was that Dixon should be sentenced to imprisonment for his violations of the Securities Exchange Act and that the selection of one year as the term was not affected by the convictions on the mail fraud counts. Our affirmance of the convictions on the Securities Exchange Act and conspiracy counts will not, of course, preclude an application for reduction of sentence under F.R.Cr.P. 35 within 120 days after receipt of our mandate; we intimate nothing as to what should be done if such an application is made.

The judgments of conviction on Counts I, II and VI are affirmed; the judgments of conviction on Counts III, IV and V are reversed with instructions to dismiss.

LUMBARD, Circuit Judge (concurring):

While I join in the result reached by the majority, I add this short statement to clarify my views concerning the impropriety of Dixon's conviction for mail fraud, 18 U.S.C. § 1341. I believe that Judge Friendly somewhat overstates the case in his conclusion that appellant's decision to mail incomplete and misleading proxies was unconnected to any "larger scheme contemplating pecuniary loss to someone or direct pecuniary gain to those who designed it," ante p. 1399. To the contrary, it is clear from the record that the loans which Dixon received from AVM, and which he failed to disclose, were interest free. Since such favorable terms were presumably not available in the public financial markets, and since Dixon had unrestricted use of the money prior to its repayment, there can be no doubt that he profited in a very real sense from his access to corporate funds. That access was, however, fully authorized by the terms of the AVM charter which permitted its officers and directors to borrow from the corporation. To me, this is critical.

Certainly, the shareholders had every right to expect that appellant would reveal his activities to them. The Securities Act of 1934, moreover, required that he do so. But if we today construe the mail fraud statute to cover Dixon's lack of forthrightness, it will tomorrow be available in every instance in which the proxy rules are technically violated. Such an expansive construction is neither required nor advisable.